**CYCLO FLOOR MACHINE CORPORATION, Jerome D. Rosenberg and Tim C. Christian, Jr., Plaintiffs,**

v.

**NATIONAL HOUSEWARES, INC., Emdeko Distributing, Inc., and Easy Pipella, Mike Pipella, Dave Bigler and Keith Bigler, all partners of Orbiter, Ltd., Defendants.**

No. C 155–66.

United States District Court
D. Utah,
Central Division.

Sept. 20, 1968.

Richard W. Giauque, Grant H. Bagley, Salt Lake City, Utah, Stanton T. Law-rence, Jr., Charles E. McKenney, New York City, for plaintiffs Cyclo Floor Machine Corp. and Jerome D. Rosenberg.

Lynn G. Foster, Salt Lake City, Utah, Jack E. Dominik, Chicago, Ill., for plaintiff Tim Christian, Jr.

Richard S. Fox, Salt Lake City, Utah, William Poms and Guy Porter Smith, Los Angeles, Cal., for defendant National Housewares, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHRISTENSEN, District Judge.

This case having been tried to the court, argued, briefed and submitted for decision, the court now makes and enters the following

## FINDINGS OF FACT
### GENERAL

1. Plaintiff, Cyclo Floor Machine Corporation is a New Jersey corporation having offices at 226 Springfield Avenue, Newark, New Jersey and limited assets. Plaintiff, Jerome D. Rosenberg, is a citizen of the State of New Jersey, residing at 3 Shadow Lawn Drive, Livingston, New Jersey.

2. Plaintiff, Tim C. Christian, Jr., is a citizen of the State of Illinois, residing at 2530 East Bonnybrook Lane, Waukegan, Illinois.

3. Defendants, National Housewares, Inc. and Emdeko Distributing, Inc., are Utah corporations having their principal places of business at 1260 East Vine Street, Salt Lake City, Utah. Defendants, Easy Pipella, Mike Pipella, Dave Bigler and Keith Bigler, are citizens of the State of Utah and are partners in the partnership Orbiter, Ltd. which has its place of business at 1260 East Vine Street, Salt Lake City, Utah.

4. Plaintiffs Cyclo Floor Machine Corporation and Jerome D. Rosenberg brought this action by a Complaint against Defendant, National Housewares, Inc., filed August 15, 1966, based upon alleged breach of written agreements and infringement of United States Letters Patent No. 2,967,315, Jerome D.

Rosenberg being owner of the legal title of said Letters Patent at the time of filing of this action. Plaintiffs asserted that the written agreements created a duty in Defendant "not to deal in floor machines which compete with the 'Cyclo' floor machine" and that Defendant had breached such duty by selling a floor machine "similar to plaintiffs' patented 'Cyclo' floor machine * * * in competition with the 'Cyclo' floor machines." Plaintiffs made a joint demand for a final injunction against further breach of the agreements by Defendant and against further alleged infringement of the Letters Patent.

5. Subsequently, Plaintiffs amended their pleadings to eliminate their claim that Defendants could not deal in floor machines which compete with the "Cyclo" floor machine. After the trial began, Plaintiffs stipulated that Defendants had the right to deal, manufacture or sell a floor polishing machine which competed with the "Cyclo" floor machine subject to Plaintiffs' patent rights under the patent in suit.

6. Defendant, National Housewares, Inc., filed its "Answer to Amended Complaint and Counterclaim" on or prior to January 1, 1967, denying breach of the Exh. 1 "Cyclo Agreement" and the Exh. 2 "Key Distributor Agreement, denying infringement of United States Letters Patent No. 2,967,315, alleged affirmatively by way of defense that said Letters Patent No. 2,967,315 is invalid on various grounds and by way of counterclaim requested a declaratory judgment of patent invalidity and non-infringement of Patent No. 2,967,315 under the provisions of the Declaratory Relief Act 28 U.S.C. § 2201 and the Patent Laws of the United States, Title 35 U.S.C., for damages incurred because of Plaintiffs' misuse of Letters Patent No. 2,967,315 in an attempt to unlawfully extend the scope of said patent by joining it with the contract action in an effort to restrain Defendants from dealing in competing floor machines, for damages due to Plaintiffs' alleged breach of implied and express warranties as to the mer-

chantability of floor machines sold by Plaintiffs to Defendants and for other alleged breaches of said agreements by Plaintiffs and for damages claimed to be due to Plaintiffs' attempts to enforce said agreements in a manner in violation of the antitrust laws of the United States. Plaintiffs replied to Defendants' Answer and Counterclaim denying the allegations of Defendants' counterclaims on or about February 25, 1967. During the trial Defendants abandoned their antitrust and patent misuse claims and defenses.

7. In November, 1966, during the pendency of this litigation, Plaintiff, Jerome D. Rosenberg, assigned all of his rights in the patent in suit, including the right to recover for past infringement, to Tim Christian, Jr. On or about November, 1966, Plaintiff, Cyclo Floor Machine Corporation, discontinued operating its floor machine business. Plaintiffs then filed a "Second Amended Complaint" withdrawing their demands for an injunction against further breach of said agreements. Defendants filed their Answer to the Second Amended Complaint and Counterclaims in March, 1967, to which Plaintiffs replied in April, 1967. On Plaintiffs' motion that Tim Christian, Jr. be joined as a plaintiff, heard March 9, 1967, and it appearing to the Court upon representation of Plaintiffs that Patent No. 2,967,315 was assigned to said Tim Christian, Jr. by Plaintiff Jerome D. Rosenberg subsequent to commencement of this action, this Court ordered that Tim Christian, Jr. be joined as a party plaintiff by its Order entered May 16, 1967 and that the action be continued without prejudice to any proceedings already had herein.

8. On April 27, 1967, Plaintiff Tim Christian, Jr. and Cyclo Designs, Inc. of Waukegan and Chicago, Illinois, commenced an action in the United States District Court for the District of Iowa, Davenport Division, against Terry J. Ferguson and Judel Enterprises, Inc., Civil Action File No. 3–379–D, alleging infringement of the Letters Patent in

suit No. 2,967,315 due to the sale of floor polishing machines by Ferguson and Judel Enterprises. Said action in the District Court of Iowa has been stayed by order of that court pending the outcome of the within action. Ferguson and Judel Enterprises, Inc. submitted themselves to the personal jurisdiction of this Court by an affidavit appearance filed on or about May 28, 1967.

9. Tim Christian, Jr. subsequently requested this Court to rescind its prior Order of May 15, 1967 joining him as an additional party plaintiff by a motion before this Court heard on July 10, 1967. In view of said hearing, it was ordered, adjudged and decreed by this Court's Order of July 17, 1967: that Tim Christian remained joined as a party plaintiff pursuant to Rule 25(c) of the F.R.Civ.P.; that the issues of validity and infringement of Patent No. 2,967,315 in suit were to be determined by this Court in this action and that the parties hereto and their assignees or successors in interest, including Christian, will be bound by such determination; and that Christian was to be served with a Copy of the Order, various pleadings and was given an opportunity to enter and actively participate in this action during a 20 day period of time after service of the Order during which all discovery and other proceedings in the action were continued. Christian responded by filing a petition for writ of prohibition in the United States Court of Appeals for the Tenth Circuit which was subsequently denied.

10. Christian later filed a "Cross-Complaint" against Jerome D. Rosenberg and/or Cyclo Floor Machine Corporation for rescission of his agreement to purchase the Letters Patent in suit from Plaintiff, Rosenberg, for return of monies paid for alleged damages due to fraudulent acts of Plaintiff, Rosenberg and/or Cyclo Floor Machine Corporation, for an injunction against Plaintiff Rosenberg's continued attachment of the inventory of Christian or Cyclo Designs in Littlestown, Pennsylvania and requiring Plaintiff, Rosenberg and/or Cyclo Floor Machine Corporation to forbear from interfering with Christian's and/or Cyclo Designs' business activities pursuant to a contract of November 23, 1966 appended as Exh. A to the Cross-Complaint. The issues of Plaintiff Christian's Cross-Complaint against Plaintiffs Rosenberg and Cyclo Floor Machine Corporation have been severed from the issues of the patent and contract actions asserted by Plaintiffs against Defendants for separate trial thereon.

## THE PATENT ACTION

11. The Helbig et al. patent No. 2,-967,315 in suit relates to polishing or abrading machines and in particular to a handpropelled floor polishing machine with a single eccentrically driven surface treating head. Machines of this class, including the machine disclosed in the '315 patent in suit and as heretofore sold by Plaintiffs, can be used for polishing, sanding, abrading, scrubbing and surface treating operations. The relevant prior art in light of which the patent in suit must be considered includes a variety of surface treating machines adaptable for polishing, scrubbing, sanding or abrading, depending upon the particular surface treating head utilized with the machine. The prior art surface treating machines of Defendants' Exhs. A and B teach one skilled in the art to interchangeably use the different polishing, scrubbing, abrading and sanding heads with the various types of drive mechanisms disclosed in said patents, depending upon the surface treating operation for which the machine is to be used.

12. The Patent No. 2,967,315 in suit is directed to a design of eccentrically driven surface treating machine in which both internally and externally applied unbalancing forces which tend to cause vibration in the machine are balanced by a counterweight system. The internal forces acting upon the machine are due to the eccentric mounting of the surface treating head to be driven in an orbital or eccentric manner. The external forces acting on the machine are due to the friction occurring between the surface treating head and the work

surface being treated during operation of the machine. The disclosure of Messrs. Helbig and Warner teaches the location of a counterweight with its center of gravity in the same plane as the center of gravity of the eccentrically moving surface treated head in order to balance the internal forces. An auxiliary counterweight portion 40a and 40b of counterweight 35 is provided in the '315 patent disclosure to supposedly counteract the friction forces exerted on the surface treating head due to friction between the bristles 26 and the work surface being treated. The effect of counterweight portions 40a and 40b is to move the effective center of gravity of counterweight 35 into a position above a horizontal line drawn through shafts 31 and 33 in Fig. 3 of the '315 patent in suit so that the center of gravity in the overall counterweight will be positioned to counterbalance the resultant forces acting on the machine due to the combination of the friction force represented by vector 44 and the centrifugal force of the eccentrically moving surface treating head represented by the vector 43 in Fig. 6. The result claimed for the patented machine is the reduction of vibration due to these forces.

13. The patent in suit discloses and claims in claims 1 and 6 a hand-propelled floor polisher or the like, including a polishing head 13, a motor 19 for the polisher having a shaft 33 projecting therefrom, means including a bearing (unnumbered) and a detachable pin 31 for pivotally mounting the head 13 eccentrically of the motor shaft 33 and affording free rotation of head 13 about its pivotal axis (axis of pin 31). Head 13 is claimed as having a hollow portion therein opening upwardly and extending about its pivotal axis and having a center of gravity lying in a plane normal to the pivotal axis of the head and extending through the hollow portion of the head. The mounting means for mounting the head eccentrically of motor shaft 33 is further stated in claims 1 and 6 to include a plate 32 secured to the motor shaft 33, which plate includes an offset portion (unnumbered) lying within the hollow portion of the head laterally of the bearing. A counterweight 35 is secured to the offset portion on the side of the head mounting means (plate 32) opposite to the pivotal axis (pin 31) of the head with the center of gravity of the counterweight 35 lying substantially in the plane of the center of gravity of the head aforementioned such that the counterweight and the head rotate with their centers of gravity substantially in the same plane for balancing the rotating portions of said head with minimum force coupled about axes transverse to the axis of rotation of said shaft.

14. The counterweight 35 and auxiliary portions 40a and 40b of the counterweight system disclosed and as claimed in claims 3, 4 and 5 of the patent in suit operate as an integral mass to counterbalance the resultant force due to the internal forces exerted upon the machine due to the eccentric movement of the surface treating head and the external or reactive forces exerted upon the machine due to the friction between the surface treating head and the surface upon which the machine is operating. The particular configuration of counterweight and auxiliary counterweight 35 and auxiliary portions 40a and 40b chosen by Messrs. Helbig and Warner were designed to meet a specific condition of use and are not adjustable for different uses of the machine. The specific configuration of counterweight 35 and auxiliary portions 40a and 40b of the '315 patent in suit is not critical to the practice of the alleged invention thereof but is the mechanical equivalent of any configuration of counterweight whose center of gravity lies on a line leading or spaced ahead of a plane through the two shafts 31 and 33 in Fig. 2 of the patent in suit (Helbig Deposition, Exhibit G, P. 103; Warner Deposition, Exhibit H, P. 62; and testimony of Martin Seigel).

15. No new result is obtained by the machine disclosed and claimed in patent 2,967,315 over that obtained by prior art machines. The counterbalancing of

internal forces by locating the counterweight "with its center of gravity substantially in said plane within the hollow portion of said head whereby said counterweight and said head rotate with their centers of gravity substantially in the same plane for balancing the rotative portions of said head with minimum force coupled about axes transverse to the axis of rotation of said shaft" of claims 1, 2 and 6 is fully taught in the prior Champayne patent No. 2,751,725. The balancing of both external forces due to friction between the surface treating head and the internal forces of claims 3, 4 and 5 is fully taught and anticipated by the prior Heymes et al. patent No. 2,909,871.

16. The prior Champayne Patent No. 2,751,725 teaches the location of the center of gravity of a counterweight 44 in the plane 45 which is also the plane passing through a hollow space 46 of the surface treating head 12 in which the center of gravity of head 12 is positioned. Such location of the center of gravity of the counterweight in the same plane as the center of gravity of the eccentrically moving surface treating head for balancing the rotating portions of the head with minimum force couples in the '315 patent required no more than the exercise of ordinary skill in the art. Such location of the center of gravity of counterweight 35 in the same plane as the center of gravity of the surface treating head 13 by Messrs. Helbig and Warner would have been obvious to one skilled in the art at the time of the alleged invention thereof by Messrs. Helbig and Warner in view of the prior Champayne patent No. 2,751,725. Such location of the centers of gravity of a counterbalance relative to the mass being balanced is further taught in machine design textbooks such as the 1954 edition of Dynamics in Machines by Crosley, particularly section 4–2.

17. In attempting to obtain the object of producing a vibration-free machine, the disclosure and claims 1 and 6 of the Letters Patent No. 2,967,315 are directed to the supposed new result of locating the center of gravity of a counterweight in a machine having an eccentrically driven hollow-headed surface treating head whereby the counterweight and head rotate with their centers of gravity substantially in the same plane "for balancing the rotating portions of the head with minimum force couples about axes transverse to the axis of rotation of said shaft." The asserted new result of "minimum force couples about axes transverse to the axis of rotation of said shaft" is merely the same old result obtained in the prior Champayne patent No. 2,751,725. There is no new result obtained by the apparatus of claims 1 and 6 of the '315 patent not obtained by the apparatus of the prior patents of Exhs. A and B.

18. At the trial of this action, it was shown that none of the individual components of the Helbig et al. patent are novel. The prior art patents of Defendants' Exhs. A and B and the testimony of Defendants' expert, Martin Siegel, establish that each of the elements of claims 1 through 6 are old. Hand-propelled floor polisher machines are found in the prior Heckroth, Steibel, Gerber and Ebersole patents. The preamble of the claims refer to a hand-propelled floor polisher "or the like" such as the hand held polisher-sander machine sold by Polymatic Industries under license from Plaintiff Rosenberg. Several prior patents are within the "or the like" requirement of the preamble of claims 1 through 6 of the Letters Patent in suit. A motor having a motor shaft is an old element found in several prior art references. Means including a bearing and a detachable pin for pivotally mounting a surface treating head eccentrically of the motor shaft and affording free rotation of the head about its pivotal axis are old in the cited Heckroth patent, the non-cited prior Helbig Patent No. 2,759,-305 and the non-cited Higley Patent No. 2,942,384. A surface treating head having a hollow portion therein opening upwardly and extending about its pivotal axis is old in each of the cited Steibel patent No. 2,545,635 and the uncited

Buzzell patent No. 233,067, Scace patent No. 2,683,336, and Champayne patent No. 2,751,725. A hollow head having its center of gravity lying in a plane normal to the pivotal axis of the head and extending through the hollow portion of the head is old in each of the prior Steibel, Buzzell and Champayne patents.

19. A mounting means for the surface treating head which includes a plate secured to the motor shaft (as plate 32 in the '315 patent) is old in view of the prior Heckroth, Buzzell, Champayne, Helbig '305, Moore and Higley patents. A plate operating as part of the surface treating head mounting means which includes an offset portion is taught in the prior Higley patent 2,942,384 and, as broadly interpreted by Plaintiffs, in the prior Moore, Scace and Jepson patents. In each of the aforementioned patents, a counterweight is secured to the offset portion on the side of the mounting means opposite the pivotal axis of the surface treating head. All of the elements of claims 1 and 6 are old in the art. Further, the arrangement or combination of parts or elements in order to place the center of gravity of the surface treating head is taught in Champayne and closely approached in Higley, Scace, Moore and Jepson. Defendants' expert, Martin Siegel, testified that the location of the center of gravity of the counterweight slightly out of the plane of the center of gravity of the surface treating head would not adversely affect the operation of the machine in a practical sense since such vertical force couples tending to tip the machine are far less detrimental to the satisfactory operation of the machine than are unbalanced forces in the horizontal plane tending to create centrifugal unbalancing forces.

20. The mounting of the handle resiliently to the motor as required in claim 2 is within the skill of a person of ordinary skill in the art as shown by the prior patents of Defendants' Exhs. A and B.

21. The alleged invention of claims 3, 4 and 5 of the patent in suit pertaining to the use of a counterweight for overcoming both the inertia or internal forces exerted upon the machine due to the eccentrically moving surface treating head and the reactive forces due to external or friction forces exerted upon the machine due to contact between the surface treating head and the surface being treated is fully taught and anticipated by the prior Heymes et al. patent 2,909,871. There is no teaching as to the counterbalancing of reactive forces between the surface treating head and the work surface being treated in the Letters Patent in suit not taught in the Heymes patent No. 2,909,871. The additional requirements of claims 3 through 5 over claims 1 and 6 of the patent in suit are fully met by the Heymes et al. patent No. 2,-909,871. It would be well within the skill of a person of ordinary skill in the art to utilize the floor brush polishing head of the prior Steibel patent No. 2,-545,635 in place of the surface treating head of the Heymes et al. patent No. 2,-909,871. Heymes teaches the location of the center of gravity of mass M in substantially the plane of the center of gravity of the surface treating head, as illustrated in Fig. 1 of Heymes. The requirements of claims 3 through 5 are fully met by the combination of the surface treating head of Steibel with the drive mechanism of Heymes.

22. The assemblage of elements in the '315 patent in suit which are all old and previously known and used in the prior art is the product of mere mechanical skill of a person having ordinary skill in the art. The prior art taught Messrs. Helbig and Warner how to achieve their objects of reducing vibration due to both external and internal forces in eccentrically driven floor polishing machines. Helbig's prior patent No. 2,759,305 taught the use of an eccentric or crank arm drive mechanism identical to that utilized in the patent in suit. The prior Steibel patent owned by S. C. Johnson and Sons and the Johnson floor polishing machine considered by Cyclo Mfg. Co. in its predesign sales promotional considerations taught the use of

a hollow floor brush or head to lower the center of gravity of its drive mechanism relative to the head. Machine design courses and good engineering practice taught Messrs. Helbig and Warner to place the center of gravity of the counterweight in the same plane as the center of gravity of the mass of the surface treating head being balanced. This exact teaching was available to workers skilled in the art in the disclosure of the prior Champayne patent No. 2,751,725.

23. The prior Higley patent taught workers in the art to use an offset arm for mounting a counterweight offset from a surface treating head mounting plate as used in the patent in suit. The prior Scace, Moore and Jepson patents taught workers in the art to use a surface treating head mounting means from which a counterweight portion could be suspended in order to place the counterweight down near the center of gravity of the head. The prior art Heymes patent taught the positioning of the center of gravity of the counterweight in a location to counterbalance both the external and internal forces acting on the machine as done by Messrs. Helbig and Warner. These teachings of the prior art render the Helbig et al. patent obvious to one skilled in the art.

24. At the trial, Warren Jessup, patent expert for the plaintiffs, stated that in his opinion, the inventive subject matter of claims 1 and 6 of the patent in suit '315 was the recognition that a dished head could be used as a uniquely suitable vehicle so that the counterweight can be offset down into the head. He further stated that not one patent cited by the Defendants in their prior art books of patents showed this inventive concept. However, the old (1880) Buzzell patent discloses the use of a dished or hollow polishing head B eccentrically mounted to a drive shaft J with counterweights a" offset down (below lower end of drive shaft J) into the hollow or dished portion of the head. Similarly, the Champayne patent No. 2,751,725 teaches the location of a counterweight 44 positioned offset from the motor shaft down in a hollow portion 46 of the surface treating head 12.

25. Messrs. Helbig and Warner were employees of Cyclo Mfg. of Denver, Colorado, in 1957 when they filed the application Serial No. 637,684 (which issued as the patent in suit) and assigned it to Cyclo Mfg. Co. Prior to entering the manufacture of the Cyclo "polisher-scrubber machine" at the end of 1956 or the beginning of 1957, Cyclo Mfg. Co. had manufactured only a twin-headed polisher called the "Wonder Tool" which is illustrated in a prior Helbig patent No. 2,759,305. Mr. Helbig was requested by others in Cyclo Mfg. Co. to design a floor machine to expand the company's product line from the single "basic" machine of the prior Helbig patent 2,759,-305. Messrs. Helbig, Warner and Riepe were familiar with floor polishing machines available on the market prior to beginning the design of the machine of patent 2,967,315. As part of the intended sales program for the new machine to be designed by Mr. Helbig, Mr. Riepe, Vice President in charge of sales for Cyclo Mfg. Co., had devised a sales program wherein the new machine was to be compared with the Johnson floor machine then available on the market. Mr. Riepe agreed that the Johnson unit with which the new Cyclo Mfg. Co. floor polishing machine was to be compared was similar to the floor polishing machine illustrated in the Steibel patent No. 2,545,635 which issued to the S. C. Johnson & Sons Company of Racine, Wisconsin. The deposition testimony of the co-inventor Mr. Helbig shows that Mr. Helbig did not consider the shape of the floor polishing brush and brush holder of the Letters Patent in suit to have been novel at the time of filing the application for the Letters Patent in suit and that the particular configuration of brush and brush holder (sometimes referred to as a dished head during the trial of this action) are similar to that illustrated in the Johnson Company's prior Steibel patent No. 2,545,635.

26. In the actual manufacture of machines in accordance with the Letters

Patent in suit, Cyclo Mfg. Co. utilized various parts for the Johnson floor polishing machine including the handle, cord, switch and cord holder which were purchased from the local distributor of S. C. Johnson Company parts. The evidence presented through the depositions of Messrs. Riepe and Helbig of Cyclo Mfg. Co. indicates that the Cyclo Mfg. Co. floor polishing machine of patent No. 2,967,315 in suit was intended and designed to compete with the Johnson floor machine then available on the market and utilized the design of various parts thereof, other than the drive mechanism, including the design and configuration of the brush head and handle of the Johnson machine.

27. Messrs. Helbig and Warner utilized the identical eccentric drive mechanism of the prior Helbig patent No. 2,-759,305 in combination with the Johnson floor machine or Steibel patent No. 2,-545,635 brush head. The combination of the eccentric drive mechanism of the prior Helbig patent No. 2,759,305 with the floor polishing or brush head of the Steibel patent No. 2,545,635 required no more skill than that expected of a person of ordinary skill in the art of surface treating machines as illustrated by the various patents in Defendants' prior art books. Such combination of a dished or hollow surface treating head with an eccentric drive mechanism to place the counterweight down in the hollow head is suggested in the prior Buzzell patent No. 233,067 (not cited), Champayne Patent No. 2,751,725 (not cited) and Helbig's own prior patent No. 2,759,305 (not cited) at Column 11, lines 61–66.

28. The two brush heads and associated counterweights in the prior Helbig patent 2,759,305 balance each other during operation of that machine. In utilizing the drive mechanism and the counterweight principle of the prior Helbig patent No. 2,759,305 in the Helbig et al. patent in suit 2,967,315, a single headed machine, Messrs. Helbig and Warner relocated the counterweight of the prior '305 patent on the end of an offset arm portion as illustrated in Fig. 2 of the

'315 patent in order to place the center of gravity of the counterweight in the same plane as that in which the center of gravity of the surface treating head of the machine lies. Such relocation of the counterweight 35 of the '315 patent from that illustrated in the '305 patent merely followed generally accepted, good engineering practices as taught in machine design textbooks. The application of the principle of locating the center of gravity of a counterweight in the same plane as the center of gravity of the eccentrically moving mass being balanced, taught by the textbook is applied in the same manner as in the patent in suit in the prior Champayne patent No. 2,751,725.

29. In 1957, when Mr. Helbig filed the application for the Letters Patent in suit, he thought that it was novel to use an eccentric drive mechanism for a scrubber-polisher machine which could be used on the floor, he then being unaware of the prior Heckroth patent No. 2,023,588. On becoming aware of the Heckroth patent, which was cited by the Patent Office, he realized that it was not novel to apply the eccentric drive mechanism of his prior '305 patent to a floor machine as illustrated in his '315 patent in suit. Mr. Helbig also had thought that it was novel to apply the principle of locating the center of gravity of the counterweight in the same plane as the center of gravity of the eccentrically moving mass in a surface treating machine having an eccentric drive mechanism. He had obtained a Bachelor of Science Degree in Mechanical Engineering prior to his employment with Cyclo Mfg. Co. and testified that he had learned in machine design courses in school how to counterbalance a single mass rotating about a vertical axis by placing a mass directly opposite it and in the same plane as taught in the "very fundamental" teaching of "Dynamics of Machines" by F. R. Erskine Crosley prior to the time that he did his design work on the second Helbig patent '315. However, Mr. Helbig stated in his deposition testimony that he believed that he was the first person to

apply the basic machine design principle of counter-balancing to a polishing machine and pointed out that the Patent Office had apparently agreed with him since they had "issued the patent on it". After considering the disclosure of the Champayne patent No. 2,551,725, during the taking of his deposition, Mr. Helbig agreed that the prior Champayne '725 patent teaches locating the center of gravity of the counterweight in the same plane as that in which the center of gravity of the eccentrically driven surface treating head lies and that he now no longer considers himself to be the first to apply the principle or teaching of the textbook to an eccentrically driven polishing or sanding machine. Mr. Helbig considered that it was not novel to mount the counterweight 35 in the '315 patent from an offset arm to locate it in the desired location at the time of filing of his application and Mr. Siegel, Defendants' technical expert, testified that the use of an offset arm for the location of the counterweight in the '315 patent could not be considered to constitute any principle of machine design but was merely an obvious means for locating the weight in the desired spot. The patented machine of the patent in suit is merely the product of ordinary mechanical skill applied by Messrs. Helbig and Warner to old elements found in, and available to workers in, the prior art.

30. The disclosure of the patent in suit is an assemblage of elements, previously known and used by others prior to Messrs. Helbig and Warner, which does not add to the sum of useful knowledge available to workers in the art. The differences, if any, between the subject matter sought to be patented in claims 1 through 6 of patent No. 2,967,315 in suit and the prior art patents of Defendants' Exhibits A and B, are such that the subject matter of claims 1 through 6 as a whole would have been obvious at the time the alleged invention was made to a person having ordinary skill in the art to which patent 2,967,315 pertains.

31. Plaintiff Rosenberg placed all six claims of the Helbig et al. patent No. 2,967,315 in issue through the general charges of patent infringement in the original and subsequent three Amended Complaints. During pre-trial discovery, Plaintiff Rosenberg narrowed his charges of infringement against Defendants to only claims 1 and 6 of the patent in suit. Plaintiff Rosenberg has conceded the non-infringement of claims 2 through 5 by the Orbiter machine heretofore sold by Defendants. The issue of infringement of claims 1 and 6 was contested at the trial, but in view of the court's ruling of non-validity, it is considered unnecessary and inappropriate to rule upon the question of infringement.

## CONTRACT ACTION

32. During the period 1959–61, the Plaintiff, Cyclo, was engaged in selling floor polishing machines and other items at both the wholesale and retail level.

33. In the fall of 1961, Plaintiff, Cyclo, received two or three orders for Cyclo Floor Machines ("Cyclo") from Easy Distributors of Great Falls, Montana, a concern operated by Easy Pipella, now President of the Defendant, National Housewares, Inc.

34. In March, 1962, the defendant National was formed, and within a month thereafter, Easy Pipella, National President, and Keith Bigler, National Secretary-Treasurer, journeyed to plaintiff Rosenberg's home in Newark, New Jersey, to discuss the possibility of obtaining for National the exclusive rights to market the Cyclo floor machine in the United States. The terms and conditions of such an arrangement were discussed and an agreement was reached at that time, based upon mutual promises of performance by Plaintiff Cyclo and Defendant National, in effect that National would become the sole and exclusive nationwide distributor of Cyclo floor machines.

35. Messrs. Jerome Rosenberg, Easy Pipella, and Keith Bigler, at the time they discussed and reached agreement on the nationwide Cyclo distributorship program in 1962, were all men of long and

considerable business experience. Each was, at that time, or had previously been, a distributor of household items, including floor polishing machines, and each was familiar with the respective functions, duties and responsibilities of parties to an exclusive distributorship arrangement.

36. By letters of March 31, and April 3, 1962, the Plaintiff Cyclo confirmed the exclusive distributorship agreement previously reached with National and at that time confirmed the following essential terms of that agreement: (a) that Plaintiff Cyclo would produce "Cyclo" exclusively for sale by National, (b) that National would distribute Plaintiff's "Cyclo" exclusively throughout the United States, (c) that the direct price to National per machine was to be $37.80 F.O.B. factory, and (d) that National would pay all warehouse, storage, insurance, add freight charges on the shipment of Cyclos by Plaintiff to National's warehouses or other points of distribution.

37. Although in the earlier letters of March 31, 1962, Plaintiff Cyclo had discussed both (a) a six months minimum cancellation clause and/or (b) a 30-day notice of termination period, all references to termination periods, or notice thereof, were eliminated, at the request of National, in Plaintiff Cyclo's confirming letter of April 3, 1962.

38. National, by letter of July 26, 1962, to Plaintiff Cyclo, reaffirmed its intent to act as the exclusive distributor of "Cyclos" throughout the United States and in that respect, indicated that Plaintiff Cyclo could expect National to develop an effective distributor organization with the potential of increasing sales volume "many times". In that letter, Mr. Keith Bigler, Secretary-Treasurer of National, agreed to each term of the Cyclo-National relationship as set forth in Plaintiff Cyclo's earlier letter of April 3, 1962, and sought to add thereto provisions regarding minimum quantities to be manufactured by Plaintiff Cyclo and purchased by National. These latter provisions were mutually agreed to be unnecessary and did not become part of the agreement among the parties.

39. National, in this same letter of July 26, 1962, urged that the agreement between the parties be reduced to writing and reiterated that National was "looking forward to a long and mutually profitable association" with the Plaintiff Cyclo.

40. On or about May 17, 1962, Plaintiff Cyclo notified National in writing that the "Cyclo" was covered by a United States patent, and transmitted to National a copy of the patent papers. Throughout the relationship of Plaintiff Cyclo and Defendant National, the fact that the Cyclo machine was a patented article was emphasized by National in its Cyclo sales program.

41. From March, 1962, to April, 1965, the Defendant National continued to act as Plaintiff Cyclo's exclusive National distributor of "Cyclos" pursuant to the oral understanding reached among the parties in 1962.

42. On or about April 1, 1965, at the request of Easy Pipella of National, Plaintiff Cyclo stopped production of the Cyclo machine; within a week to 10 days thereafter, Keith Bigler of National told Plaintiff Rosenberg that he had no right under their arrangement to unilaterally stop production and demanded that Plaintiff Cyclo commence production immediately and ship all available Cyclo machines to National by air freight. This Plaintiff Cyclo did, and National and Cyclo shared the expense of the air freight shipment.

43. On or about April 14, 1965, Plaintiff Cyclo and National entered into two written agreements, identified as Exhibits 1 and 2. Each was signed, respectively, by Jerome Rosenberg as President of Cyclo Floor Machine Corporation and Easy Pipella as President of National, and the signatures of each were notarized.

44. The Cyclo agreement, Exhibit 1, one of the two agreements executed by the parties on April 14, 1965, covered the various terms and conditions normally

essential to the creation of an exclusive distributorship relationship, and when executed by the parties, it became a binding, enforceable contract between them.

45. The "Cyclo" agreement provided in Paragraph 1 that Plaintiff Cyclo would continue to manufacture the "Cyclo" machine exclusively for Defendant National and that National would continue to act as Plaintiff Cyclo's exclusive national distributor of this item.

46. The Cyclo agreement contained an implied duty on the part of the Defendant National to purchase its floor machine requirements from Plaintiff Cyclo and to use its best efforts to promote the sale and distribution of Cyclo floor machines.

47. The Cyclo agreement also contained an implied duty on the part of Plaintiff Cyclo to use its best efforts to fulfill Defendant National's floor machine requirements and to refrain from selling "Cyclo" machines to persons or concerns other than National.

48. The Cyclo agreement, in Paragraph 2 thereof, provided for a price of $38.00 per machine, F.O.B. factory, this price to be firm for one year, from May 1, 1965, to May 1, 1966. Plaintiff Cyclo continued to sell to National and National continued to buy from Plaintiff Cyclo at this price from the date the agreement was executed until their relationship was terminated on or about October 27, 1965.

49. The Cyclo agreement, in Paragraph 3 thereof, required Plaintiff Cyclo to improve or modify the scrub brush of the Cyclo machine, but called for no changes or modifications in the motor, the counterweight system, or any other part of the Cyclo machine, despite the fact that National had theretofore complained about the frequency of repair of the motor.

50. The Plaintiff Cyclo, subsequent to the execution of the Cyclo agreement, did improve the scrub brush on the Cyclo floor machine in substantial compliance with Paragraph 3 of the Cyclo agreement.

51. The Plaintiff Cyclo, subsequent to the execution of the Cyclo agreement, did replace defective parts on the Cyclo floor machines.

52. The Plaintiff Cyclo, subsequent to the execution of the Cyclo agreement, did make a new book on the Cyclo floor machine and submitted a proof thereof to Defendant National for its approval in claimed compliance with Paragraph 5 of the Cyclo agreement, and while the evidence indicates that this was more of a sales brochure than an instruction book and National itself got out an instruction book, there was no reliance upon this discrepancy by National as a breach of the agreement, and the court believes that there was at least substantial compliance on the part of plaintiff of said agreement under all of the circumstances of the case.

53. The Plaintiff Cyclo, subsequent to the execution of the Cyclo agreement, continued to warehouse Cyclo floor machines in several locations in the United States so as to allow defendant National to draw from said warehouses on a cash basis, in substantial compliance with Paragraph 6 of the Cyclo agreement.

54. The Plaintiff Cyclo, subsequent to the execution of the Cyclo agreement, maintained a reasonably ample supply of Cyclo floor machines in these various warehouses throughout the United States, in substantial compliance with Paragraph 6 of the Cyclo agreement.

55. Plaintiff Cyclo, subsequent to the execution of the Cyclo agreement, directed inquiries on the Cyclo floor machine to Defendant National within 7 days from the date received, as agreed in Paragraph 8 of the Cyclo agreement.

56. The Defendant National, subsequent to the execution of the Cyclo agreement, and until approximately October 1, 1965, gave reasonably adequate service and took care of repairs arising from the sale of Plaintiff Cyclo's equipment, in substantial compliance with Paragraph 9 of the Cyclo agreement.

57. The "X machine" agreement, Exhibit 2, provides, among other things not now pertinent, that Plaintiff Cyclo would develop another orbital-action floor treating machine (the "X" machine) exclusively for the Defendant National.

58. Plaintiff Cyclo developed a production model of the "X" machine but Defendant National informed Plaintiff Cyclo in the summer of 1965 that it did not intend to purchase any "X" machines from Plaintiff Cyclo. Plaintiff made no further effort to manufacture this item for the Defendant National or anyone else.

59. Subsequent to execution of the Cyclo agreement on April 14, 1965, the Defendant National continued to act as Plaintiff Cyclo's exclusive national distributor of Cyclos until about October 27, 1965.

60. In late 1964 or early 1965, the Defendant National contacted Casady Engineering for the purpose of determining whether Casady could develop another orbital-action floor polishing machine for use by National.

61. Sometime prior to the date the Cyclo agreement was executed, National had orally authorized Casady to arrange for the design of another orbital-action polishing machine, and on or about May 1, 1965, National confirmed in writing its previous oral authorization to Casady Engineering to develop such a machine.

62. Throughout the period May–October, 1965, Casady Engineering, in conjunction with Messrs. Storm and Smiley, engaged itself in designing and developing the "Orbiter" machine for National; Casady rendered monthly progress reports to National on its work, and National paid Casady monthly for the same.

63. Each month during the period from May to October, 1965, the reports the Defendant National received from Casady were more optimistic as to the date that production of the "Orbiter" machine would commence.

64. National, sometime during this May–October, 1965, period, had decided to terminate its relation with the Plaintiff Cyclo upon completion of a production model of the "Orbiter" machine.

65. Plaintiff Rosenberg repeatedly during May–October, 1965, confronted the officers of National with reported rumors concerning National's plans to develop its own floor machine, and on each occasion the officers of National denied that there was any truth to these reports.

66. At no time during this May–October, 1965 period did National or any of its officers notify Plaintiffs that a decision had been reached by National to terminate its distributorship agreement with Plaintiff Cyclo upon completion of a production model of the "Orbiter" machine.

67. At no time during the period between the execution of the agreement on April 14, 1965, and October 27, 1965, did Defendant National notify the Plaintiffs of its intent to terminate its distributorship relation with Plaintiff Cyclo, either orally or in writing.

68. During the period May–October, 1965, Defendant National ordered large numbers of Cyclo parts, particularly in August, 1965, to build an inventory of parts in anticipation of its termination of relationship with Plaintiff Cyclo.

69. By letter of October 1, 1965, Plaintiff Cyclo announced to National that Cyclo was in the process of expanding its manufacturing facilities for the production of Cyclo machines for National; National made no response to this announcement.

70. On or about October 27, 1965, Easy Pipella informed Plaintiff Rosenberg by telephone that the relationship between National and Cyclo was "finished" and that National would no longer purchase or distribute Cyclo Floor machines. This was the first and only notice of termination given by National to the Plaintiff Cyclo.

71. In an attempt to mitigate damage, Plaintiff Cyclo in the early weeks of November, 1965, attempted to sell Cyclo machines to others and did sell

small quantities thereof to others in November and December, 1965; in this respect, Plaintiff Cyclo, by letters of November 24, 1965 and December 2, 1965, informed "all former dealers" of Cyclo that National was no longer the exclusive distributor for the Cyclo floor machine, and offered to sell Cyclos to those former dealers.

72. The fundamental relationship between Plaintiff Cyclo and Defendant National, and the respective functions and duties of each, remained substantially the same throughout the period March 1962 to October, 1965, both before and after execution of the Cyclo agreement.

73. Throughout the period of the distributor relationship between plaintiff Cyclo and Defendant National, National maintained bonded warehouses, to which Plaintiff Cyclo would ship Cyclos; National would withdraw its requirements of Cyclos from those warehouses and would then recruit payment by check to Plaintiff Cyclo for the machines withdrawn.

74. Throughout the period of the distributor relationship between plaintiff Cyclo and Defendant National, and pursuant to the warehousing arrangement under which the parties acted, Plaintiff Cyclo had in effect a continuing order from National for Cyclos in such quantities as were necessary to supply the requirements of Defendant National, including warehouse inventory requests. Many times during this relationship, Defendant National requested shipments of Cyclos, without specification of a particular quantity, and similarly, Plaintiff Cyclo would, from time to time, ship Cyclo machines to Defendant National without any order whatever, aside from the continuing order mentioned. All warehouse withdrawals were confirmed by written invoices.

75. Throughout the period of the distributor relationship between Plaintiff Cyclo and Defendant National, the Plaintiff Cyclo was required to, and did, in fact, refer sales leads and inquiries on

Cyclos to National; further, Plaintiff Cyclo was prohibited from selling "Cyclos" to anyone other than Defendant National, except with the consent and authority of Defendant National.

76. Plaintiff Cyclo did continue, during this period, to sell floor machines other than Cyclo, to persons and concerns other than Defendant National, such machines including Gem, Yale, Goldbond, and Electromatic machines. Each of these items was larger in size and different in appearance from the Cyclo.

77. During the period of the distributor relationship between Plaintiff Cyclo and Defendant National, there were certain mechanical difficulties encountered with some of the Cyclo machines; Defendant National from time to time brought these difficulties to the attention of Plaintiff Cyclo, and over this period, Plaintiff Cyclo made various changes in the machine in an attempt to minimize service problems and create a trouble free machine. There were extensive repair difficulties claimed by National at the trial but the court is convinced that many of them were exaggerated by reason of National's plan concealed from plaintiff, to replace the Cyclo machine, and many of these claims were merely an attempted excuse for doing so.

78. During the period of this distributor relationship between Plaintiff Cyclo and Defendant National, principals of the two companies were in day-to-day direct telephone communication with one another; in such communications, the parties discussed their respective marketing and production problems and plans.

79. During the period of this distributor relationship between them, the parties worked together closely to maximize the volume of sales of Cyclo machines.

80. At no time during the Plaintiff Cyclo-Defendant National distributor relationship, did the Plaintiff Cyclo condition its sale of Cyclo machines to de-

fendant National, either expressly or impliedly, upon the agreement of Defendant National to refrain from handling any competing line of floor treating machines.

81. Plaintiff Cyclo did not, during its distributor relationship with Defendant National attempt to induce any of Defendant National's dealers or distributors to cease dealing with Defendant National or to purchase Cyclo floor machines directly from Plaintiff Cyclo.

82. Easy Pipella or no other official of Defendant National ever, at any time during Defendant National's distributor relationship with Plaintiff Cyclo, represented, either expressly or impliedly, that Defendant National reserved or retained the right to summarily terminate that relationship without reasonable notice to Cyclo.

83. Between March, 1962, and October, 1965, Defendant National's sales of Cyclos increased from 103 machines per month in January, 1962, to 1530 machines per month in October, 1965.

84. Plaintiff Cyclo's sales, in dollars, of Cyclo floor machines during the pertinent period were:

| | |
|---|---:|
| 1961 | $ 35,156.00 |
| 1962 | 165,858.00 |
| 1963 | 128,973.00 |
| 1964 | 242,267.00 |
| 1965 | 468,092.00 |
| 1966 | 42,409.00 |

85. In 1966, the year following termination by Defendant National of its distributorship relation with Plaintiff Cyclo, Plaintiff Cyclo's sales volume of Cyclos declined by more than $400,000.00 from its 1965 Cyclo sales volume.

86. The sales of the defendants increased from year to year during the period involved as follows:

| | National Housewares, Inc. | Emdeko Distributing, Inc. | Orbiter, Ltd. | Totals |
|---|---:|---:|---:|---:|
| 1963 | $ 983,910 | | | $ 983,910 |
| 1964 | 1,231,701 | | | 1,231,701 |
| 1965 | 4,396,239 | | | 4,396,239 |
| 1966 | 8,520,310 | $ 455,905 | $462,829 | 9,439,044 |
| 1967 | 10,253,909 | 1,099,898 | 34,752 | 11,388,559 |
| 1968* | 10,382,679 | N.A. | N.A. | 10,382,679 |

*(10 mos.)

87. The net profits of the defendants increased from year to year during the period involved as follows:

| | National Housewares, Inc. | Emdeko Distributing, Inc. | Orbiter, Ltd. | Totals |
|---|---:|---:|---:|---:|
| 1963 | $ 35,903 | | | $ 35,903 |
| 1964 | 90,368 | | | 90,368 |
| 1965 | 377,783 | | | 377,783 |
| 1966 | 587,813 | $18,256 | $145,883 | 751,952 |
| 1967 | 508,719 | 43,502 | 214,052 | 766,273 |
| 1968* | 557,778 | N.A. | N.A. | 557,778 |

*(10 mos.)

88. Throughout the period March, 1962, to October, 1965, during which Defendant National acted as Plaintiff Cyclo's exclusive national distributor of the Cyclos, the cost of a "Cyclo" machine to Plaintiff Cyclo was approximately $38.00, and the suggested retail list price thereon was $269.85.

89. The Plaintiff Cyclo, during the period of its relationship with Defendant National, realized a profit of approximately $12.00 per unit on its sales of Cyclo machines to Defendant National; Plaintiff Cyclo's total cost per unit, including the cost of parts, cost of assembly, freight expense, cost of replacement parts supplied Defendant National, and a reasonable allocation of general office and administrative expenses, was approximately $26.00 and Plaintiff Cyclo sold the Cyclo machine to Defendant National during this period at $38.00 per unit.

90. At the time Defendant National terminated its relationship with the Plaintiff Cyclo, Cyclo had an inventory of some 600 completed machines in its warehouse in Littletown, Pennsylvania, and had the components of approximately 6,000 motors in stock. Plaintiff Cyclo was able to sell some 400 of the completed machines on hand without a loss, but sustained a loss of approximately $3.00 per motor on resale of the motors and components.

91. During 1965, the last year of its relationship with Defendant National, the Plaintiff Cyclo was working ahead on its production schedule between six months and one year; Plaintiff Cyclo was programming its production to accommodate an increasing volume of sales of Cyclo machines to Defendant National during this period.

92. The Defendant has not established any damage from any failures of Plaintiffs subsequent to April 15, 1965. The parties in their April 1965 agreements took into account and resolved by mutual agreement difficulties that they were theretofore experiencing; having

made special provision with respect to brushes and repairs without reference to motor modifications, I find that there was no agreement with respect to motors or otherwise that was substantially breached thereafter by plaintiff, and believe that many of the subsequent complaints were occasioned by a predetermined resolve on the part of the defendants to cease doing business with plaintiff as soon as their secret efforts to develop a competing machine had met with success.

93. As a result of the failure of the Defendant National to give reasonable notice to Plaintiff Cyclo of its intent to terminate the contract, Plaintiff Cyclo sustained damage to its business and property, in an amount the court finds to be $15,000.00 per month or $90,000.00 for a period of six months.

94. Plaintiff Cyclo sustained further damage in the amount of $18,000.00 as a result of a forced sale of its inventory of motors and motor parts at a loss in said amount.

95. Plaintiff Cyclo had made reasonable efforts to sell Cyclo machines to others after Defendant National's termination of the Cyclo contract and, finding that only small quantities could be sold, disposed of the inventory of parts at the minimum of loss, all by way of mitigation of plaintiff Cyclo's damages.

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter and has venue of this action (28 U.S.C. § 1338 (a) and (b), § 1400 and § 2201).

2. Plaintiff, Jerome D. Rosenberg, was owner of legal title to the Letters Patent in suit No. 2,967,315 at the time of filing the original Complaint herein. During the pendency of this action, Plaintiff Tim Christian, Jr. became owner of legal title, including the right to recover for past infringement, to said Letters Patent. Both Plaintiffs Rosenberg and Christian, in addition to Plaintiff Cyclo Floor Machine Corporation,

are parties to this litigation and are bound by this Court's determination of the issues of patent validity.

3. The presumption of patent validity attendant the issuance of Letters Patent by the United States Patent Office is not conclusive and is overcome where, as here, the evidence demonstrates error in the Patent Office's ex parte determination and failure to consider pertinent prior art. Applying the applicable law to the facts as hereinbefore found, the Court concludes that the most pertinent prior art patents were not considered by the Patent Office and that Letters Patent No. 2,967,315 were granted and issued in error.

4. The Helbig et al. polishing machine of patent No. 2,967,315, being an assemblage of elements previously known and used, is entitled to patent protection only if it can be shown to "promote the progress of science and useful arts". Art. I, Sec. 8, U.S. Constitution. Congress has particularized the standard of patentability by requiring that an invention be endowed with the qualities of novelty, utility and non-obviousness before being entitled to a legal monopoly (35 U.S.C.A. §§ 101–103). Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

5. Applying the relevant statutory law (35 U.S.C. §§ 101–103) to the facts as hereinbefore found and in view of the standard of invention enunciated by the Supreme Court of the United States previously noted herein, this Court concludes that United States Letters Patent No. 2,967,315, and each of the claims 1 through 6 thereof, are invalid.

6. Each and every claim of the Helbig et al. patent No. 2,967,315 here in suit is invalid because the combination of elements claimed therein is old and performs or produces no new or different function or operation than that theretofore performed or produced by them in the prior art. The differences, if any, between the claimed subject matter of the patent in suit and the teachings of the prior art are such that the claimed machine of patent No. 2,967,315 would have been obvious at the time of the alleged invention thereof to a person having ordinary skill in the art. Mott Corp. v. Sunflower Industries, Inc., 314 F.2d 872 (10th Cir. 1963).

7. The patented machine of claims 1 through 6 of the Helbig patent No. 2,967,315 is the product of mere mechanical skill and is not patentable. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545; Carson and Rosproy v. Bland and B & D Distributing Co., 398 F.2d 423 (10th Cir. 1968); Hutchinson Mfg. Co. v. Mayrath, 192 F.2d 110 (10th Cir. 1951); and Richards & Conover v. Leishman, 172 F.2d 365 (10th Cir. 1949).

8. The conjunction of novelty and utility does not entitle a creation to patent protection if the device merely consists of an aggregation of old elements which are drawn from the public domain and which produce expected results. Griswold v. Oil Capital Valve Co., 375 F.2d 532 (10th Cir. 1967).

9. An invalid patent cannot be infringed. Carson and Rosproy v. Bland and B & D Distributing Co., supra; Consolidated Electro. Corp. v. Midwestern Instruments, Inc., 260 F.2d 811 (10th Cir. 1958). Therefore, the question of infringement need not be considered.

10. The interpretation and enforcement of the Exhibits 1 and 2 contract are governed by the law of the State of Utah, the place of the making of the contract.

11. The State of Utah adopted the Uniform Commercial Code on January 1, 1966 which provides in part that transactions entered into before the effective date will not be affected by the provisions of the Code. The provisions of the Uniform Commercial Code therefore do not apply to the Exhibits 1 and 2 contract which was entered into April 14, 1965.

12. The Defendant National had a duty under the Cyclo agreement to purchase Cyclo floor machines from the Plaintiff Cyclo and to promote the sale of those floor machines.

13. The Plaintiff Cyclo substantially performed its obligations under the Cyclo agreement up to the time said agreement was terminated by the Defendant National on or about October 27, 1965.

14. The defendant substantially performed its obligations under the Cyclo agreement up to the time it was terminated by the Defendant National on or about October 27, 1965.

15. The Plaintiff Cyclo did not terminate the Cyclo agreement.

16. The Cyclo agreement was not, either expressly or impliedly, terminable at will.

17. The terminating party to the Cyclo agreement was under an implied duty to give reasonable notice of termination.

18. Reasonable notice, under all circumstances, would be notice of at least six months.

19. The Defendant did not give to Plaintiff Cyclo any practical, reasonable notice of its intent to terminate the contract.

20. Plaintiff is entitled to judgment against Defendant National Housewares for $108,000.00, and Defendant's counterclaims for damages should be dismissed; Defendants are entitled to a declaration that said patent is invalid and that Plaintiffs' claim for patent infringement should be dismissed, each party to pay its own costs.

The Defendants shall submit to the Court within 15 days a form of judgment in conformity with these conclusions after submission to counsel for Plaintiffs for approval as to form, it being understood that by such submission and approval no party waives any substantive position it has heretofore taken or now takes as to the law or evidence in the case.