375 F.2d 532
 Donald G. GRISWOLD and Cla-Val Co., Inc., Appellants,
v.
OIL CAPITAL VALVE CO., Aeroparts Manufacturing Co., Robert E. Radford, and Dorothy Joyce Radford, as an individual and as Trustee for Joseph Britton Radford, Janice Joyce, Radford, Robert E. Radford, Jr., Appellees.
 No. 8194.
 United States Court of Appeals Tenth Circuit.
 December 19, 1966.
 Rehearing Denied May 22, 1967.
 
 Harry W. F. Glemser, of Bacon & Thomas, Washington, D. C. (John R. Richards, of Houston, Klein & Davidson, Tulsa, Okl., of counsel, with him on the brief), for appellants.
 William S. Dorman, Tulsa, Okl. (James G. Davidson, Tulsa, Okl., with him on the brief), for appellees.
 Before HILL, SETH and HICKEY, Circuit Judges.
 SETH, Circuit Judge.
 
 
 1
 This appeal involves the validity of two patents. The appellants, plaintiffs below, brought an action for infringement of two patents against the appellees. The appellees, defendants below, then sought a declaratory judgment that appellants' patents were invalid and not infringed, and sought damages from the appellants for unfair competition and violation of the federal antitrust statutes.
 
 
 2
 The trial court found the patents invalid, and also concluded that appellants' use of the invalid patents constituted unfair competition and a violation of the antitrust statutes on appellees' counterclaim. The District Court retained jurisdiction of the action, pending this appeal, to determine the appellees' damages on the counterclaim.
 
 
 3
 The first patent to be considered is Griswold No. 2,609,099 (hereinafter "099"). Patent 099 is a device for separating two immiscible liquids, and the primary commercial use of patent 099 is the separation of water from gasoline it has contaminated. Patent 099 is a "combination" patent, and its components include a separator casing and three valves. Water separated from the fuel in the separator casing is collected in a chamber within the casing. A float is positioned to ride on the interface between the water and fuel. As the water level varies within the chamber, the movement of the float controls a pilot valve. The pilot valve in turn controls by hydraulic means a fuel discharge valve and a water drain valve. It is the purpose of the patented 099 system to provide a continuous flow of "clean" fuel through the separator, as would be required for fueling aircraft. The float-controlled pilot valve of patent 099 is thus designed to hold the fuel discharge valve open continuously, except when the separator's capacity is overwhelmed by an influx of water. The pilot valve is also designed to hold the water drain valve open continuously, except when the level of water in the collection chamber is very low. Thus the pilot valve, depending on the movement of the float in the collection chamber, permits both the fuel discharge valve and the water drain valve to be open at the same time, or closes one or the other, as described above.
 
 
 4
 The second patent in question is Griswold No. 2,888,032 (hereinafter "032"). Patent 032 is a rate-of-flow control device and it can be used in conjunction with the 099 fuel-water separation system to regulate the flow of "clean" fuel from the separator. Patent 032 is also a "combination" patent and its components include a main valve, a bypass pilot valve, a needle valve, and an orifice plate. The orifice place is located upstream of the main valve. Fuel passing through the orifice plate creates a pressure differential, which in turn actuates the bypass pilot valve. The pilot valve, by hydraulic means, controls operation of the main valve. It is the purpose of the patented 032 system to provide a uniform rate of flow for "clean" fuel passing through the main valve from the separator.
 
 
 5
 The application for patent 099 was filed December 9, 1944, and the patent was issued September 2, 1952. The application for patent 032 was filed October 27, 1952, and the patent was issued May 26, 1959.
 
 
 6
 Since late 1944 the appellants, or their predecessors, have manufactured the valve components of the 099 fuel-water separator. However, appellants did not manufacture the separator casing which is a component of the patented 099 system; the casing was manufactured by the Warner Lewis Company. The appellants supplied the valve components to Warner Lewis Company which attached the appellants' valves to Warner Lewis separator casings and sold the complete separator to Warner Lewis customers. Some time after October 1952 the appellants were also able to provide a rate-of-flow control device, when necessary, for use with their 099 valves on Warner Lewis separators. The rate-of-flow control device was that system covered by patent 032.
 
 
 7
 It appears that some time in 1960 the appellees offered to supply, and did supply, Warner Lewis Company with valve components for a fuel-water separator and a rate-of-flow control device. The appellees' valve components and rate-of-flow control device perform the same functions as the appellants' patented valve components and flow control device; the appellees' valves and control device are generally quite similar to those manufactured by the appellants under the 099 and 032 patents. The appellants and appellees were thus competing for the customers of the Warner Lewis Company, which sold the complete fuel-water separator.
 
 
 8
 Appellants learned that an important contract was to be let for Warner Lewis separators equipped with valves manufactured by appellees. The appellants directed letters to various parties advising that the appellees' valves infringed the appellants' 099 patent, and warned these parties of possible legal action. Thereafter the appellants filed suit, claiming infringement of their 099 and 032 patents. The appellants then sent letters to "the trade" telling of the pending litigation.
 
 
 The Griswold Patent No. 2,609,099:
 
 
 9
 There is no doubt that the appellants' 099 patent has been a successful commercial device; apparently more than half of the water-fuel separators in use in this country are equipped with the appellants' valves. The valve system in question was first perfected by the appellants in early 1944, in response to requests by the Navy and the Army Air Corps. Presumably the need for a separation device like 099 was coincident with the increased military air activity. The record shows that in early 1944 the military conducted a series of tests with various types of separators and various "name brand" control valves, among which was a Warner Lewis separator equipped with a two-way Clayton pilot valve attached only to a fuel discharge valve. The Clayton valve used was a model 126 valve which appellants had manufactured since 1935. Other valves by other manufacturers tested at the same time were found not as satisfactory as the Clayton arrangement on the Warner Lewis separator. The appellants witnessed this test and were requested by the military to work out a design for the float-controlled pilot valve inside the separator casing and to provide a pilot valve that would also control a water drain valve as well as the fuel discharge valve. The report drawn up after these various tests indicates that the Clayton two-way pilot valve connected to a fuel discharge valve had the greatest possibility for providing what the military needed. The report also indicates that the other valves tested were less satisfactory. The report relates that by a "simple modification of its seat and disc" the Clayton 126 valve may be modified to control the water drain valve. Appellants returned to California and within at the most several weeks designed the pilot valve that is one element of the 099 patent, which connected and controlled both a fuel discharge valve and a water drain valve. An appendix to the report indicates that appellants' new system was tested on March 10, 1944, and was found satisfactory. The record also shows that appellants had manufactured water drain valves, fuel discharge valves, and pilot valves for some time, but that in early 1944 was the first time a system combining a float-controlled three-way pilot valve controlling both a water drain valve and a fuel discharge valve had been constructed by the appellants. This combination became patent 099.
 
 
 10
 The trial court found that 099 was not valid because it had been anticipated by two uncited patents known as the Thompson and the Walker patents which will be described in some detail hereinafter. Claim 2 of 099 is the broadest claim and the trial court compared it with the Thompson and Walker patents. Thus, with respect to Claim 2 of 099, and Claim 1 also, the trial court has found that these claims lack the fundamental criterion of patentability — "novelty" or "newness."
 
 
 11
 After disposing of 099's broadest claim (No. 2), the court in finding No. 11 goes on to find that the Thompson patent meets every substantial limitation of the remaining claims of 099 which are at issue. Also the trial court in findings Nos. 8 through 13 found that the uncited Thompson and Walker patents had "exhausted" the combination claimed by Griswold in patent 099. Although the court does not explain what an "exhausted combination" is, it appears that finding No. 8, which reads the broadest claim of the 099 patent against the disclosures of the Thompson patent, is meant to show that the 099 patent was fully anticipated by Thompson, and also fully anticipated by Walker as shown in finding No. 9.
 
 
 12
 The other findings of the trial court also demonstrate that the other claims of 099 did not reveal anything new or novel. Thus, the first eleven of the twelve claims of 099 were found to be anticipated by the Walker and Thompson patents. The trial court in its more general findings also refers to other patents antedating 099. Thus, as to the separation of two immiscible liquids the court refers to Pink, Samiran '543, Ryan et al, Samiran '757, Lewis, Spangler, and another Thompson patent. On the matter of valves or a valve operated by a float the court mentions the same group of patents; on the hydraulic operation of a valve by a float the court again refers to Pink and Spangler, and on the simultaneous control of two valves by a single float reference is made to the Ryan et al patent. The patents cited in the 099 patent, together with the Thompson and Walker patents, which were not cited but which are part of prior art, all disclose in one way or another float controlled discharge and drain valves, operated by mechanical means or by hydraulic means and through a pilot valve, the court found.
 
 
 13
 A brief reference to the devices and claims of the Thompson patent, and the Walker patent is necessary, as is a reference to the Ryan patent. The Ryan patent cited in the prosecution of 099 discloses a float capable of operating a water drain valve and a fuel discharge valve simultaneously, except by direct mechanical means rather than by a hydraulic pilot valve.
 
 
 14
 The uncited Thompson patent, No. 2,036,730, discloses a device for separating two immiscible liquids, particularly a device for separating oil and water, as would be required aboard ships. The Thompson device includes a series of quiescent chambers and baffles through which the oil and water mixture passes. These chambers and baffles reduce the velocity of the mixture and promote gravity separation of the oil and water. The separated oil is conveyed to a collection dome from which the oil is discharged when a predetermined quantity is accumulated. A float within the collection dome controls a pilot valve. When the float in the dome reaches a certain level, indicating that the desired amount of oil has been accumulated, the pilot valve opens the oil discharge valve by hydraulic or other means. After the accumulated oil is discharged the level of the float causes the pilot valve to close the oil discharge valve until another batch of oil is collected in the dome. An alternative configuration of the Thompson device shows both an oil discharge valve and a water drain valve opened and closed by a hydraulically operated piston controlled by the float and pilot valve. Because the Thompson device is designed to accumulate and discharge oil in a "batch" process, the oil discharge valve and the water drain valve cannot both be open at the same time — when one valve is open the other must be closed.
 
 
 15
 The uncited Walker patent, No. 1,846,376, discloses an invention pertaining to improved fluid controls for a gas and liquid separator, essentially for auxiliary use when the separator's primary controls fail to function. The Walker device includes an auxiliary float chamber in which a float is positioned. When the storage level of oil in the separator exceeds that desired, and if the oil valve is not opened mechanically by the float in the primary chamber, the excess oil flows into the Walker auxiliary chamber, causing the float to actuate a fluid-operated pilot valve. The pilot valve opens the oil valve and closes the gas valve, permitting gas pressure to expel the excess oil through the oil valve. In normal or primary operation the Walker float-operated pilot valve does not control the gas valve or oil valve. Of the different configurations suggested for the auxiliary controls in the Walker patent, none show the float-operated auxiliary pilot valve designed to hold both the oil valve and gas valve open at the same time, nor will the pilot valve close the oil valve while holding the gas valve open.
 
 
 16
 The somewhat different result or purpose achieved by the several devices is claimed to result from the function of the various elements described in the claims. Thus, Thompson discloses an apparatus for separating oil from water at a relatively slow rate. It provides for an accumulation of a quantity of oil, and then discharges the accumulated batch of oil. This discharge of oil and also the draining of water from the Thompson device, according to the drawings, specifications, and the claims of Thompson, may be accomplished by manual, hydraulic, or electrical means. The specifications of 099 on the other hand explain that the device is designed to separate two immiscible fluids, more particularly gasoline and water, at a rapid rate, and continuously. It provides by the float-controlled pilot valve a separator wherein the valve controlling the discharge of pure gasoline is always open, unless a large influx of water overwhelms the separator's capacity. It also provides that the valve controlling the draining of water from the separator is always open, except when the accumulated water is at a very low level.
 
 
 17
 In 099 both the discharge valve and the drain valve can be open at the same time. This is described in 099's specifications and indicated in the drawings, but is not alluded to in any of its first eleven claims. In this respect the 099 function permits both valves to be open at the same time, or one open and one closed, as controlled by float and pilot valve. In this respect the device differs from Thompson where the oil drain valve opens, the water valve must close and vice versa; both cannot be open at the same time.
 
 
 18
 Thus 099 consists of a valve to drain the water, a valve to draw off the gasoline, and a pilot valve controlled by a float to operate the first two mentioned. All of these parts were old, but appellant urges that the combination was patentable. The appellants urge that the "three-way" feature of 099 (meaning the float-operated pilot valve which would operate the discharge and drain valves so that one or the other would be open or they would both be open) was revealed to the Patent Office in the specifications of 099, and specifically in Claim 12. This particular aspect of the invention was never challenged according to the file wrapper of 099, where the major problem in having the patent allowed was showing that conduits connected the pilot valve to the fuel discharge valve and the water drain valve; that is, that hydraulic lines connected the valves. Throughout the trial, and in the appeal brief, the appellants have emphasized the three-way feature to save their patent. Moreover, the appellants also claim that even in the broadest claims of 099 (Nos. 1 and 2), language appears which can be construed to make the three-way feature an explicit limitation of those claims. This language in part is:
 
 
 19
 "A float * * * connected with * * * pilot valve for actuating said pilot valve * * * for controlling the opening and closing of said * * * valves in accordance with the rise and fall of said float in said float chamber as the level of the heavier liquid in said float chamber varies." (Claim 2 of 099).
 
 
 20
 The appellants further point to the different purposes of Thompson and Walker. In Thompson they say the batch accumulation of pure oil separated from water in quiescent zones at as low a velocity as possible, and in Walker the separation of a liquid and a gas and the use of pilot valves as auxiliary controls in a batch operation are different from the 099 patent, designed to separate fuel from water as rapidly as possible and to provide a continuous flow of fuel, except when the separator is overwhelmed by a "slug" of water. Thus they say 099 was not anticipated by Thompson or Walker.
 
 
 21
 The drawings and specifications of 099 may be used to illustrate or explain the claimed invention; but not, of course, to enlarge or alter them. Thus when all these matters are considered, were the claims of 099, was the invention, anticipated by the named patents? Or was the "three-way" operation of the water and oil valves sufficient to make it patentable?
 
 
 22
 The Griswold patent 099 is, of course, presumed to be valid and the appellees have the burden of establishing its asserted invalidity by clear and convincing evidence. 35 U.S.C.A. § 282; King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc., 354 F.2d 533 (10th Cir.). The ground for the invalidity alleged by appellees is basically one of anticipation and aggregation. Necessarily they have the burden on this issue. McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381 (10th Cir.); Mott Corp. v. Sunflower Industries, Inc., 314 F.2d 872 (10th Cir.). Further the patent in issue is presented by all parties as a combination of valves and pilot or control valves with appurtenant controls, all of which were known in the art. The appellees also contend that their devices add some additional features not present in the Griswold 099.
 
 
 23
 The trial court's findings above referred to, and especially the one referring to 099 as directed to an "exhausted combination," as shown in two other named patents, place the conclusion of the trial court on anticipation or an aggregation of old elements. The general state of the prior art is not referred to by the trial court although in the findings there are references to some nine prior patents.
 
 
 24
 The doctrine of anticipation by patents is a narrow and technical one. To come within it, all the elements of the invention, or comparable ones, must do substantially the same work in substantially the same way and be within one structure. McCullough Tool Co. v. Well Surveys, Inc., supra.
 
 
 25
 As to the matter of aggregation, the doctrine requires that the prior patents, or the art generally, demonstrate the segments or elements with substantially the same results and functions. Again referring to the McCullough Tool case, supra, it was there said: "In order to anticipate a patent for a combination, the prior art must disclose all of the elements of such combination or their mechanical equivalents, functioning in substantially the same way to produce substantially the same result." Also: "It is enough if the whole of the prior art considered together discloses all of the claimed elements and that no new functional relationship arises from their combination." In Williams Iron Works Co. v. Hughes Tool Co., 109 F.2d 500 (10th Cir.), this court considered a combination of old elements and held that such was patentable if the discovery and application of the new combination require greater skill than would be expected of an ordinary mechanic trained in the art, and whereby a new result is obtained or an old one in a "more facile, economical, and efficient way."
 
 
 26
 The issue then centers on the question whether the combination in 099 required a skill greater than would be expected of an ordinary mechanic trained in the art. The prior patents contained all the elements and provided for a pilot valve to control the two discharge valves to void the separated substances from the container. The difference in 099 urged by appellants is that the two valves would both be opened at the same time while before one was closed when the other opened by reason of the mechanical or hydraulic connections. This change in the combination was not of such nature that would require more than the ordinary skill of a mechanic trained in the art. The trial court so found in effect, and we agree. The ultimate question of the validity of 099 is, of course, a question of law for the court to decide. Mott Corp. v. Sunflower Industries, Inc., 314 F.2d 872 (10th Cir.); M. B. Skinner Co. v. Continental Industries, Inc., 346 F. 2d 170 (10th Cir.). Thus the Griswold Patent No. 2,609,099 was not valid, and there could have been no infringement of it.
 
 
 27
 
 The Griswold Patent No. 2,888,032 — Rate of Flow Controller:
 
 
 
 28
 Turning to the Griswold patent No. 2,888,032, appellants' flow controller, the trial court also found it to be invalid, but for different reasons than 099. In findings of fact Nos. 24 through 28, the trial court found that the appellants' data sheet, which described the flow controller ultimately embodied in patent 032, was a statutory bar to obtaining the patent under 35 U.S.C.A. § 102(b): "A person shall be entitled to a patent unless * * (b) the invention was * * * described in a printed publication in this * * * country or in public use or on sale in this country, more than one year prior to the date of the application for patent * *."
 
 
 29
 The evidence with respect to whether or not the appellants' data sheet describing a flow controller was published on April 25, 1951, and advertised the device shown thereon for sale was somewhat vague. The appellants and their witnesses testified that these data sheets were distributed to interested parties and appellants themselves said it was an offer for sale.
 
 
 30
 The trial court's findings that the data sheet was a printed publication of a given date and offered for sale the device shown thereon is supported by the evidence.
 
 
 31
 However, the appellants argued at trial and in their brief that the flow controller shown on the data sheet did not operate satisfactorily, and was not commercially suitable for the purpose for which it was designed. In their brief, the appellants state that the flow controller shown on the data sheet was inoperative. Thus the appellants seek to void the effect of the published data sheet by showing that it was not anticipatory because it did not work. The Supreme Court in United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, observes that an "inoperable invention or one which fails to achieve its intended result does not negative novelty," citing Smith v. Snow, 294 U.S. 1, 17, 55 S.Ct. 279, 79 L.Ed. 721. The appellants argue that because the flow controller shown on the data sheet is "inoperative," it does not matter whether or not the data sheet was published or the item was offered for sale — the 032 patent could not be anticipated by a publication showing an inoperative device. There is evidence in the record however that it did work, but not as well as hoped for, and that some were sold.
 
 
 32
 The evidence reveals that the changes necessary to make the data sheet device work properly were primarily changing the size of the bypass pilot valve and adding an "equalizer tube," not shown on the data sheet.
 
 
 33
 The trial court concluded that the data sheet was a statutory bar, so it must be assumed that the court found sub silentio that either (1) the data sheet device was operative, or (2) that the data sheet nevertheless made sufficient disclosures so that a person skilled in the art to which it pertains would be able to practice the invention to the same extent as if the information on the data sheet were derived from a prior patent. McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 398 (10th Cir.). There was conflicting testimony as to what a person skilled in the art could do using the data sheet. Each party's expert said that it could or could not be done from the disclosure of the data sheet. The trial court resolved the issue in favor of the appellees' expert, thus finding in effect that the data sheet did disclose sufficient information which, when combined with the ability of a person skilled in the art, would permit practice of the invention shown in the patent or its equivalent. We agree. Thus the Griswold patent No. 2,888,032 was also invalid, and there would have been no infringement of it.
 
 
 Damages on the Counterclaim:
 
 
 34
 We have before us no issue relating to the damages sought by appellees on the counterclaim although argued by the parties. This appeal was taken under Rule 54 from the final appealable judgment entered by the trial court. This held the patents to be invalid, and did not include an issue of damages.
 
 
 35
 Affirmed.