**CANRON, INC., Plaintiff,**

v.

**PLASSER AMERICAN CORPORATION,
Defendant.**

Civ. A. No. 77–294–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

June 15, 1978.

Joel A. Kolodny, Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., Robert Clemency, Michael, Best & Friedrich, Milwaukee, Wis., for plaintiff.

Gordon E. Campbell, Campbell & Hancock, Norfolk, Va., Alfred H. Plyer, Jr., Kinzer, Plyer, Dorn & McEachran, Chicago, Ill., for defendant.

## OPINION AND ORDER

CLARKE, District Judge.

This is a patent infringement action. The plaintiff, Canron, Inc., a New York corporation with its principal office and place of business at West Columbia, South Carolina, has asserted that the defendant, Plasser American Corporation (Plasser), a Delaware corporation with its principal office and place of business at Chesapeake, Virginia, is infringing U.S. Patent Re. No. 29,437, which is a reissue of U.S. Patent No. 3,832,952, by manufacturing and selling machines embodying the claimed subject matter of the reissue patent.

Plasser has denied that it infringes the patent in suit and takes the position that the patent is invalid, not infringed and unenforceable, on the bases that there has been public disclosure prior to the critical date of all novel elements of the subject matter of the patent, that Plasser's machines are materially different than the subject matter of the patent, that file wrapper estoppel applies and that Plasser has intervening rights.

Jurisdiction of this Court is based on 28 U.S.C. § 1338. The trial of the matter began on April 10, 1978. Following trial,

each party submitted post-trial memorandum of law and proposed findings of fact. On May 8, 1978, the parties submitted reply memoranda.

Canron and Plasser have for some years been competitors in the design, manufacture and sale of railroad track maintenance equipment. Each party is associated with a European organization: Canron is related by ownership to a Swiss company, Matisa Materiel Industries S.A. (Matisa), and Plasser is related by ownership to one or more Austrian companies (Plasser Austria).

The subject matter of the patent in suit is the lifting and lining device used on a tamping machine. Although the mechanism is apparently compatible with other railway maintenance equipment, chief reference during trial was made to its use on tamping machines. Tamping machines with lifting and lining capacity have been in use since the early 1960's. A tamping machine operates by engaging the track, either by the railhead or the rail base, lifting the rail vertically and compacting or tamping the ballast under the railroad ties, and lining the track horizontally. The use of tamping machines is made necessary by the constant settling of ballast, and therefore the track atop the ballast, under the loads of railway vehicles traveling over the track.

The lifting and lining mechanisms that preceded the device in the patent in suit operated largely by the use of roller clamps, mounted on a common support frame, that engaged the railhead by pivoting on an axis longitudinal with the track in an arched motion. The arched motion made it difficult to work in the area of a frog, the crossover point or switch area where two sets of tracks converge, because the arched motion required more clearance between rails than was afforded in a frog area and because the clamps could not engage the extra width and weight of a frog in a sufficiently secure manner. The area of a frog is in special need of tamping because the normal weight of traffic moving over the track is compounded in frog areas since the frog, in order to allow passage of the flanged wheels of a railway vehicle to a different track, must include gaps at points in the track where the vehicle traveling through the frog must dismount one track and remount another, resulting in greater impact at these points.

Matisa built a prototype of the patent lifting and lining device on its tamping machine, the Matisa B–13, which efficiently operated to lift and line tracks in a frog area. The mechanism operates by the use of gripping members mounted on an articulated support frame displaceable vertically and horizontally by means of hydraulic jacks. The gripping members cooperate to engage the railhead or rail base with flanged wheels, the "rail engaging means." The flanged wheels are mounted on a carrier frame that is displaceable in the horizontal plane transversely to the track. Because the distance between the flanged wheels is less than the usual distance between the interior edges of railway tracks, the carrier frame for the flanged wheels must be moved into engagement with one rail at a time. The rail is engaged on each side by the opposing pressure from the flanged wheel on the interior of the railhead or rail base and from the gripping members on the exterior edge. The ability of the mechanism to move into an engaging position with a single rail by the use of vertical and horizontal motions, or double straight line motion, rather than arched motions, permits the use of the patented mechanism in the close confines of a frog area.

The mechanism was patented by Matisa in Europe, and sales promotion work was begun in the late part of 1971. On November 24, 1972, using the same design as used in the Matisa B–13, Canron applied for a patent in the United States. The patent, U.S. Patent No. 3,832,952, was issued September 3, 1974. A reissue patent was applied for and the reissue patent, U.S. Patent Re. No. 29,437, the patent in suit, was issued October 11, 1977.

■ On the basis of all the evidence, this Court finds and concludes that plaintiff's U.S. Patent Re. No. 29,437, which is a reissue of U.S. Patent No. 3,832,952, is invalid

by virtue of having been described sufficiently in printed publications disseminated more than one year prior to the original patent application in the United States. The prior publication invalidates the contested claims of the patent in suit. Because of this finding, the Court determines that it is unnecessary to reach the issues of whether the pertinent claims of the original patent and the reissue patent are substantially dissimilar, of whether file wrapper estoppel applies, and if the patent had been found to be valid, of whether Plasser machines infringed the patent.

The statutory section governing prior publication is 35 U.S.C. § 102(b), which reads, in pertinent part:

A person shall be entitled to a patent unless—

. . . . .

(b) the invention was . . . described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for the patent in the United States . . .

The parties agree that the application for a patent was first filed in the United States on November 24, 1972. Therefore, the "critical date" with respect to publication is November 24, 1971.

■■ The burden of proof to defeat patentability by establishment of prior publication rests with Plasser, who must prove disclosure by clear and convincing evidence, *The Soundscriber Corp. v. United States,* 360 F.2d 954, 175 Ct.Cl. 644 (1966). There are three elements of publication: (1) the date of the publication; (2) the sufficiency of the description; and (3) the extent of the distribution.

■ The publication must be in the hands of the "public" prior to the critical date, November 24, 1971. The date of a mailed document for this purpose is the date it reaches the addressee. *Protein Foundation, Inc. v. Brenner,* 151 U.S.P.Q. 561 (D.D.C. 1966). The dates of some documents are conceded by the plaintiff.

■ The plaintiff does not concede the element of sufficiency of the description as to any document or as to all the documents taken together. A sufficient description is one that, in clear and exact terms, describes the invention with enough specificity to enable a person skilled in that field, at that time, prior to the critical date, "to practice the invention." *Ballantyne Instruments & Electronics, Inc. v. Wagner,* 145 U.S.P.Q. 408 (6th Cir. 1965).

■ For a document to be "published" under 35 U.S.C. § 102(b), it must be accessible to the public, defined as the members of the public who are likely to be concerned with and interested in the field of art to which the document relates, *The Garrett Corp. v. United States,* 422 F.2d 874, 190 Ct.Cl. 858 (1970). It is not a defense to an allegation of prior publication that the document was published in a foreign publication unknown in the United States, *Bone v. Commissioners of Marion County,* 251 U.S. 134, 40 S.Ct. 96, 64 L.Ed. 188 (1919). Elements to be considered in determining whether the extent of distribution is sufficient to constitute publication are the number of copies made and their availability to the public, the dissemination of the document and the intent of the distribution. Distribution to commercial organizations without restriction on their use of the document or injunction of secrecy constitutes publication, *The Garrett Corp. v. United States,* 422 F.2d 874, 190 Ct.Cl. 858 (1970). Detailed data sheets accompanying offers for sale of the invention that are privately distributed, *Griswold v. Oil Capital Valve Co.,* 152 U.S.P.Q. 95 (10th Cir. 1966), and catalogues distributed generally to the relevant trade, *Jockmus v. Leviton,* 28 F.2d 812 (2d Cir. 1928), are sufficient to constitute publication. The plaintiff concedes sufficiency of dissemination as to some documents.

The plaintiff has raised the issue of infringement as to claims 1, 2, 3, 5, 6 and 11 of the patent in suit. Claims 1 and 11 are independent claims, and claims 2, 3, 5 and 6 are claims dependent on claim 1. The language of the claims in question is set out below.

1. Apparatus for the vertical and lateral movement of a section of railway track wherein gripping members operated so as to be able to grip the two lines of rails are mounted on at least one support frame connected by articulated connecting members to a chassis movable on the track, which support frame is movable both vertically and laterally relative to said chassis under the action of lifting members or lining members, in order to move said track section and to bring it into a predetermined reference position, characterized in that said gripping members are provided for each side of the track and are transversely displaceable, substantially in a straight line along said support frame; and in that rail engaging means, for each side of the track, are mounted on the support frame and are operable to engage the track so as to face the gripping members for the same side of the track.

2. Apparatus as claimed in claim 1 in which said gripping members are also vertically displaceable in a straight line relative to said support frame.

3. Apparatus according to claim 1, characterized in that each gripping member of a line of rails is height-adjustably mounted on an intermediate chassis which is itself displaceably mounted on said support frame in a plane parallel to the plane of the track and transversely thereto.

5. Apparatus according to claim 1, characterized in that the support frame extends at least over the entire width of the railway track and supports the gripping members and the rail engaging means of two lines of rails of said track.

6. Apparatus according to claim 5, characterized in that the articulated connecting members connecting the support frame to the chassis of the vehicle comprise control members for moving said support frame longitudinally to the track or rotating the same in a plane substantially parallel to the plane of said track.

11. Apparatus for the vertical and lateral movement of a section of railway track wherein gripping members operated so as to be able to grip the two lines of rails are mounted on at least one support frame connected by articulated connecting members to a chassis movable on the track, which support frame is movable both vertically and laterally relative to said chassis under the action of lifting members or lining members, in order to move said track section and to bring it into a predetermined reference position, characterized in that said gripping members are provided for each side of the track and are transversely displaceable, in a straight line, along the support frame and vertically displaceable in relation to the support frame; and rail engaging means comprising single flange wheels, for each side of the track, are mounted on the support frame and rest, in operative position, vertically and horizontally on the rails, the single flanges of the said flanged wheels being located so as to face the gripping members for the same side of the track.

U.S. Patent Re. No. 29,437; Plaintiff's Exhibit 73 (parantheticals and emphasis relating to reissuance deleted).

Essentially, the claims taken together represent an apparatus in which gripping members (hooks) for each side of the track are displaceable horizontally and vertically in relation to a support frame, extending over the entire width of track, which itself may be rotated in a plane parallel to the track, and is displaceable in a plane parallel to the track and transversely of the track by the use of articulated connecting members (hydraulic jacks). A support frame (sub-chassis) supports rail engaging means (flanged wheels) which are operable to engage the track by facing the gripping members.

■ Each document raised by the defendant as anticipatory of the patent will be considered, first to determine whether it was disseminated prior to the critical date and, if so, second, to determine whether the extent of its dissemination constitutes publication. The documents, individually and in their totality, *see In re Palmquist*, 319

F.2d 547, 51 C.C.P.A. 839 (1963), *overruled on other grounds, In re Foster*, 343 F.2d 980, 52 C.C.P.A. 1808 (1965), which are determined to be printed publications under 35 U.S.C. § 102(b) will be used by the Court to determine with regard to each claim whether the disclosures therein are sufficiently specific to allow a person knowledgeable in the field of railway maintenance vehicles in November 1971, to "practice the invention." The state of the art is provided by the information in the file wrapper of the patent application of the patent in suit and its predecessor patent, by patents in the field that preceded the critical date and by the testimony of those witnesses knowledgeable in the field in November 1971.

The documents raised by the defendant as anticipatory are:

(1) Identical advertisements by Matisa in three publications, defendant's Exhibits T, A–14 and A–15. Exhibit T is a German language advertisement in the journal "Eisenbahntechnische Rundschau," the German language version of the "Railway Technical Review," bearing the date July and August 1971. Exhibit A–14 is an English language advertisement in the journal "Railway Gazette International" bearing the date October 1971. Exhibit A–15 is a German language advertisement in the journal "Der Eisenbahn Ingenieur" bearing the date August and September 1971.

(2) A document apparently printed by or at the direction of Matisa celebrating its twenty-fifth anniversary in 1970, found in French in defendant's Exhibit A–20 and in German in defendant's Exhibit Q under the name "Courrier Matisa." There is no translation provided, and therefore the Court cannot determine the extent of textual disclosures therein. However, the schematic representations in the documents are considered.

(3) A note in the German language journal, "Signal und Schiene," which bears the date December 1970 and is defendant's Exhibit U, summarizes the article from "Courrier Matisa" describing the Matisa B–13. Exhibit U is translated in defendant's Exhibit Z.

(4) An article about railway maintenance machines, defendant's Exhibit A–18, in the journal "Eisenbahntechnische Rundshau," the German language version of the "Railway Technical Review," bearing the date July and August 1971. A translation of the portion of the article dealing with the Matisa B–13, the prototype of the patented lifting and lining tamping machine, is found in defendant's Exhibit Y.

(5) A letter and a descriptive enclosure from Matisa to a Spanish company, defendant's Exhibit B–21, translated in defendant's Exhibit B–22, relating to the advantage of and a technical description of the Matisa B–13.

(6) A sales brochure printed by or at the direction of Matisa, including photographs of and technical specifications for the Matisa B–13, in French, defendant's Exhibit B–20; in German, defendant's Exhibits O and B–34; and in English, defendant's Exhibit P.

(7) A typewritten description on Matisa letterhead, defendant's Exhibit R, translated in defendant's Exhibit A–1, representing to be a description and technical data of the tamping machine, the Matisa B–13, and bearing the date October 1, 1971.

(8) A letter and accompanying enclosures, some of which are not before the Court, from Matisa to Professor Gerhard Schramm, author of several editions of the book, "Oberbautechnik and Oberbauwirtschaft," which means "Railway Maintenance Machinery Technique and Economy." The letter is dated November 8, 1971, and is defendant's Exhibits A–47 and B–26, with a translation in defendant's Exhibit A–48.

(9) An article, defendant's Exhibit A–19, entitled "Tamping Switches and Plain Track in Confined Areas," in "Railway Engineering International," bearing the date November 1971.

(10) Brief description in defendant's Exhibit A–17, from the journal "Eisenbahntechnische Rundschau" bearing the date November 1971, and translated in defendant's Exhibit X.

(11) Brief description in defendant's Exhibit A–16, from the journal "Railway Gazette International" bearing the date November 1971.

■ The Court presumes the date a document bears to be the date of its publication, unless proof by extrinsic evidence is offered that the date of publication is other than the date the document bears. For example, the Matisa advertisements in the first group of allegedly anticipatory documents are found in periodicals bearing the dates July and August 1971 (Exhibit T); October 1971 (Exhibit A–14); and September 1971 (Exhibit A–15). The Court presumes the date of publication of each advertisement to have been prior to the critical date. Since no contrary evidence has been offered, and in this instance, in fact, because the plaintiff agrees, the Court so finds.

The "Courrier Matisa" brochure (Exhibits A–20 and Q) indicates only that it celebrates an anniversary of the Matisa organization that occurred in 1970. The plaintiff, however, agrees that the brochure was published before the critical date. The Court so finds.

The journal "Signal und Schiene," (Exhibit U) bears the date December 1970. The plaintiff agrees that the date of publication of "Signal und Schiene" was prior to the critical date, and the Court so finds.

The journal "Eisenbahntechnische Rundshau" (Exhibit A–18) bears the date July and August 1971. The plaintiff agrees that the date of publication was prior to the critical date, and the Court so finds.

The letter and descriptive enclosure from Matisa to a Spanish company (Exhibit B–21) bears the date December 2, 197–. The final digit in the date is obscured in the copy made available to the Court. In the translation, the date is represented as 1970; this date comports with the language of the letter promising production of the Matisa B–13 in early 1971 and delivery by late 1971. The Court presumes the date of publication to have been prior to the critical date. Since no contrary evidence has been offered, the Court so finds.

The sales brochure for the Matisa B–13 (Exhibits B–20, B–34, O and P) does not bear a date. However, the plaintiff has admitted that the sales brochure was disseminated with a letter, the German language version of which is defendant's Exhibit A–31, translated in defendant's Exhibit A–32, which bears the date November 3, 1971. Willibald Kurzweil, employed by Oberau Riebel in Kaufbeuren, West Germany, a potential customer of Matisa, testified that the letter and brochure sent to his firm was received on November 8, 1971. His statement was based on the date stamp of his firm on the letter sent to Oberau Riebel, defendant's Exhibit B–33, and on Kurzweil's independent recollection of receipt of the letter and brochure. There being no evidence to the contrary, the Court finds that the letter and sales brochure were disseminated prior to the critical date.

The typewritten description on Matisa letterhead of the Matisa B–13, Exhibit R, bears the date October 1, 1971. The Court presumes the document to have been published prior to the critical date. Since there is no evidence to the contrary, the Court so finds.

The letter and enclosures in the eighth group of allegedly anticipatory documents, Exhibits A–47 and B–26, sent to Professor Schramm bear the date November 8, 1971. Furthermore, Professor Schramm testified that his notations on the letter indicate that he received the letter and enclosures on November 11, 1971. The Court finds that the letter and enclosures were disseminated prior to the critical date.

The article, "Tamping Switches and Plain Track in Confined Areas," Exhibit A–19, appeared in the journal "Railway Engineering International," bearing the date November 1971. Plaintiff's Exhibits 90 and 91 indicate clearly that the periodical for November 1971 was not published or received by subscribers until after the critical date. Disclosures in defendant's Exhibit A–19 are not pertinent to the issue in this case.

The brief descriptions of the Matisa B–13 that appeared in "Eisenbahntechnische Rundschau" and "Railway Gazette Interna-

tional" bear only the dates of those journals: November 1971. Without evidence as to the specific dates in November 1971 that these periodicals were published, the Court is unable to find that the descriptions were prior to the critical date. Disclosures in defendant's Exhibits A–16 and A–17 are not pertinent to the issue in this case.

Material published in periodicals before the critical date have clearly been disseminated to a wide enough segment of the public to constitute sufficient publication. Hence, the Matisa B–13 advertisements (Exhibits T, A–14 and A–15), which appeared in three trade periodicals, have been sufficiently disseminated. The note on the Matisa B–13 in "Signal und Schiene" (Exhibit U) and the article in "Eisenbahntechnische Rundschau" (Exhibit A–18) have also been sufficiently disseminated.

The Court finds that the brochure "Courrier Matisa" (Exhibits A–20 and Q) was disseminated to a sufficient number of persons to constitute publication. The fact that the brochure was available to the editors of the journal "Signal und Schiene" and that a synopsis of the text of the brochure was permitted in "Signal und Schiene" indicates a condition and position consistent with unrestrained dissemination.

The Court determines that there is no evidence before it regarding the letter and enclosed technical description sent by Matisa to the Spanish company. There is no information before the Court as to the nature of the company to whom the letter is addressed. Though the addressee is invited by Matisa to forward the enclosed technical description to the Spanish railway system, Caffari Renfe, there is no evidence of actual dissemination to other than the addressee. The Court will consider the language in the letter as indicative of Matisa's attitude toward dissemination, but will not consider the documents in Exhibit B–21 as printed publications disseminated to a sufficient portion of the public under 35 U.S.C. § 102(b).

The Court determines that the sales brochure (Exhibits O, P, B–20 and B–34) was disseminated to a sufficient portion of the public to constitute publication. The plaintiff has admitted that the sales brochure accompanied letters sent in a mass mailing to potential customers of Matisa and the Matisa B–13. The element of sufficiency of dissemination has been admitted as to this sales brochure.

 The defendant has not established that the typewritten specifications for the Matisa B–13, found in Exhibit R were disseminated to the public. The patent advisor for the defendant's Austrian relation, Plasser Austria, admitted that Exhibit R was almost certainly sent to the German national railroad by Matisa in confidence, a position bolstered by the fact that the Matisa B–13 was tested by the German national railroad in Mannheim. Further distribution of Exhibit R was admitted by the plaintiff to an agent of Matisa in Norway and to Professor Schramm, for use in an updated edition of his book on railway maintenance machinery. The brochure was received by Professor Schramm less than two weeks before the critical date, and (1) no further dissemination of that brochure occurred and (2) publication of the updated edition of the book could not possibly have occurred before the critical date. The Court finds that Exhibit R, the typewritten specifications for the Matisa B–13, was not sufficiently disseminated to constitute publication.

The finding regarding the typewritten specification also applies to the letters and photographic enclosures sent by Matisa to Professor Schramm. Though the letter was sent and received before the critical date, no public dissemination of the specifications was anticipated or occurred before the critical date or at any later time. The Court finds that Exhibits A–47 and B–26 were not sufficiently disseminated to constitute a publication.

The Court finds, after considering the date and extent of dissemination that the following documents were "printed publications" under 35 U.S.C. § 102(b):

(a) Advertisements by Matisa for the Matisa B–13 (Exhibits T, A–14 and A–15);

(b) The drawing, but not the text, in "Courrier Matisa" (Exhibits A–20 and Q);

(c) The note describing the Matisa B–13 in "Signal und Schiene" (Exhibit U);

(d) The article of the Matisa B–13 in "Eisenbahntechnische Rundshau" (Exhibit A–18); and

(e) The Matisa B–13 sales brochure printed in German, French and English (Exhibits B–20, B–34, O and P).

With regard to the category (e) printed publications, the defendant has made as an exhibit in this case enlargements of photographs in the sales brochure. The enlargements were obtained by rephotographing the photographs printed in the brochure and printing enlarged photographs from the negatives so procured. The process is not difficult and would have been available to any person to whom the brochure would have been available. Therefore, the Court has ruled that defendant's Exhibit B–24, enlargements of the photographs in Exhibits B–20, B–34, O and P, is properly before the Court.

The Court determines that there has been an anticipatory disclosure of the elements of the claims alleged to have been infringed in this case. The pertinent information in the printed publications available to the public before the critical date in combination with the prior art anticipate the allegedly infringed claims and defeat patentability, *In re Palmquist*, 319 F.2d 547, 51 C.C.P.A. 839 (1963), *overruled on other grounds, In re Foster*, 343 F.2d 980, 52 C.C.P.A. 1808 (1965).

Each claim consists of one or more elements. Each element will be considered individually. Reference will first be made to the prior art, through other patents or through representations made in the patent in suit. Though the representations made in the patent in suit as to what was known in the field are not themselves disclosures or prior art, they will be considered as evidence of what was known in the field. Reference will be made to patents including the Stewart patent, defendant's Exhibit A–5, U.S. Patent No. 3,602,146, patented on Au-gust 31, 1971; the Plasser British patent, plaintiff's Exhibit 86 and defendant's Exhibit V, which the parties agree is the same as the German patent, defendant's Exhibit W, patented November 18, 1971; the Oville patent, referred to in the file wrapper of the patent in suit, in plaintiff's Exhibit 78; and the Plasser U.S. patent, plaintiff's Exhibit 83, U.S. Patent No. 1,204,133, patented September 3, 1970.

### Claim 1

(a) That the gripping members are able to lift the two lines of rail is acknowledged to be old by the patent in suit, column 1, lines 14 through 27, especially lines 18 and 19. The element is found on the Plasser British patent by reference to figure 1 and on the Stewart patent by reference to column 2, lines 50 through 55. The element is also disclosed by the photographs on page 3 of the Matisa B–13 sales brochure, the English language version of which is defendant's Exhibit P.

(b) Gripping members mounted on a support frame are acknowledged to be old by the patent in suit, column 1, lines 14 through 27, especially lines 18 and 19. The element is found on the Plasser British patent, where in figure 3 the lifting tools are mounted on the support beam. The photographs on page 3 of the Matisa B–13 sales brochure also disclose this element.

(c) The support frame is connected to the chassis by articulated connecting members in the patent in suit. That element is acknowledged to be old in the patent in suit, column 1, lines 14 through 27, especially lines 19 and 20. The feature is present in the Plasser British patent, figure 3, and is clearly disclosed in the photographs in the Matisa B–13 sales brochure and in the schematic drawing of the Matisa B–13 in "Courrier Matisa."

(d) A chassis that is movable on the track is acknowledged to be old in the patent in suit itself, column 1, lines 20 through 22. The feature is also present in the other patents before the Court. The fact that the machine is movable is disclosed in the publi-

cations, for example, in the note in "Signal und Schiene" in which the machine is referred to as "self-propelled," and in the technical specifications at the end of the Matisa B–13 sales brochure where the drive of the tamping machine is referred to as "travelling and advance when working."

(e) A support frame movable vertically and laterally relative to the chassis by action of the lifting and lining means is not new. This element is acknowledged to be old in the patent in suit, column 1, lines 20 through 25. It is present in the Plasser British patent, figure 3, where the lateral movement is controlled by jacks 30 and 31 and the vertical movement by 32. It is also present in the Oville patent, figure 3, and the Plasser U.S. patent, page 2, lines 20 through 26, 53 through 55, and 86 through 103, as well as claim 5. The hydraulic jacks necessary for effecting the motion described are clearly visible in the photographs in the Matisa B–13 sales brochure. A person skilled in the art could, without the use of his own inventive skill, look at the photograph and determine what effect actuating the jacks would have on the movement of the support frame.

(f) The claim states that there is a gripping member for each side of the track. Gripping members for each side of the track were known. Elements 14 and 15 of the Plasser British patent are gripping members for each side of the track. Element 22 is a gripping member for each side of the track found in the Oville patent. Claim 6 of the Stewart patent describes a device in which a rail engaging clamp, essentially a gripping member, is provided for each rail. Furthermore, the element is disclosed by the top right hand photograph on the third page of the Matisa B–13 sales brochure in which two gripping members, one for each side of the track, are visible.

(g) Gripping members transversely displaceable substantially in a straight line along the support frame are claimed to be new, in contrast to gripping members that moved in an arc. The movement can be found in the Plasser British patent, claim 3 at lines 110 and 111. The straight line movement of the gripping members is disclosed in the printed publications. In the different photographs in the Matisa B–13 sales brochure, the gripping members are shown mounted on the support frame. The frame is grooved in such a manner as to indicate that some part of the device moves transversely along it; it is clear from the photographs that the movable part is the intermediate support frame on which the gripping members are mounted. In the two photographs at the bottom of page 3, the gripping members are in slightly different relationships in the transverse plane in relation to the support frame. Furthermore, the text on page 3 of the sales brochure states that the clamps are transversely displaceable.

(h) The use of rail engaging means for each side of the track was known. The counter rollers 16 in figure 2 of the Plasser British patent are rail engaging means for each side of the track. In the Stewart patent, flanged wheels are used as rail engaging means, described in claim 6. In the schematic drawing in "Courrier Matisa," a rail engaging means is seen for the one side of the device that is represented, but there is no question but that the hidden side of the device is identical.

(i) The mounting of the rail engaging means on the support frame was known at the time of the patent application. Claim 8 and figure 4 of the Plasser British patent represent an example of the mounting of the rail engaging means on a support arm. Claim 3 of the Stewart patent is another example. The rail engaging means, as discernible in the schematic drawing in "Courrier Matisa," when compared with the photographs in the Matisa B–13 sales brochure indicate that the same element must not only be present in the photographed device but that the rail engaging means must be encased or supported by the structure that is joined to the support frame on the left and visible in all photographs, but especially the bottom left photograph on the third page. It is clear from the photographs that the rail engaging means is mounted on the support frame.

(j) That the rail engaging means engage the track by facing the gripping members for the same side of the track was known and old. The Stewart patent disclosed such a use in claims 2 and 7. Furthermore, the positioning of the rail engaging means support indicates that the rail engaging means are essentially opposite the gripping members and that they face the gripping members.

The Court determines that the elements of claim 1 of the patent in suit are not patentable because they represent a combination only of what was known in the field and what was disclosed by the printed publications that anticipated the patent.

### Claim 2

(a) The sole element of this claim is that the gripping members are vertically displaceable on a straight line relative to the support frame. This feature is apparent from the three pictures found on page 3 of the Matisa B–13 sales brochure, in which the gripping member is found in three different positions relative to the support frame. Furthermore, the claim is disclosed by representations, as in the sales brochure, that the rail can be gripped by the head or by the foot. The construction of the gripping members within the support frame precludes arched displacement consistent with the photographs. Gripping by the railhead or rail base could only be achieved by straight line vertical displacement of the gripping members.

The Court determines that the element of claim 2 of the patent in suit is not patentable because it was disclosed by printed publications that anticipated the patent.

### Claim 3

(a) Each gripping member in the patent in suit is height-adjustably mounted on an intermediate chassis. This element is fully disclosed in the photographs in the Matisa B–13 sales brochure. The intermediate chassis or intermediate support frame on which the gripping members are mounted is plain. There is a vertical groove in the center of the intermediate support frame along which the gripping members can move. The gripping members are shown in different positions in the vertical plane in relation to the intermediate support frame, and there can be no other conclusion than that the gripping members are height-adjustable in relation to the intermediate support frame.

(b) The intermediate chassis is displaceably mounted on the support frame in a plane parallel to the plane of the track and transversely thereto. This element is disclosed by the presence of grooves in the support frame that correspond to the sides of the intermediate chassis. There can be no other conclusion, when viewed by one skilled in the art, that the grooves in the support frame are guides for the transverse movement, or displaceability, of the intermediate support frame.

The Court determines that elements of claim 3 of the patent in suit are not patentable because they were disclosed by printed publications that anticipated the patent.

### Claim 5

(a) The support frame of the patent in suit extends at least over the entire width of the track. This element is disclosed by the schematic drawings appearing in "Courrier Matisa" and in the note in "Signal und Schiene," as well as in the photographs in the Matisa B–13 sales brochure.

(b) That the support frame supports the gripping members and rail engaging means of two lines of rails is not new. The same element is present in claim 3 of the Stewart patent. Further, the element is disclosed by the photographs in the Matisa B–13 sales brochure, where it is entirely clear that nothing else could be supporting either the gripping members or the rail engaging means, or to state it in the positive, that the support frame supports the gripping members and the rail engaging means.

The Court determines that the elements of claim 5 of the patent in suit are not patentable because they were disclosed by printed publications that anticipated the patent.

### Claim 6

(a) The sole element of claim 6 is that the articulated connecting members from the support frame to the vehicle chassis are the control members for moving the support frame longitudinally or rotating in a plane parallel to the plane of the track. This feature is disclosed by the language of the Matisa B–13 sales brochure, especially in conjunction with the photographs. The sales brochure states that the frame is "adjustable in the longitudinal direction . . (and) is also inclinable." The rotating movement is also disclosed in the technical specifications on page 4 of the sales brochure, where a slewing range is given, indicating an ability for the device to turn on its own axis. A person skilled in the field could determine, without resort to his own inventive skills, that these movements are accomplished by use of the articulated connecting members, hydraulic jacks, clearly visible in the photographs in the Matisa B–13 sales brochure.

The Court determines that the element of claim 6 of the patent in suit is not patentable because it was disclosed by printed publications that anticipated the patent.

### Claim 11

(a)–(g) These elements are the same as the elements of claim (1) and the discussion of those elements is incorporated by reference here.

(h) This element is the same as the element in claim 2 and the discussion of that element is incorporated by reference here.

(i) The use of rail engaging means comprising single flange wheels for each side of the track was known before the critical date and therefore was not novel. The Plasser British patent describes flanged counter rollers, essentially flanged wheels operating on each side of the track to face the gripping members, at page 2, lines 58 through 67. Flanges on wheels used on the interior edge of a rail to cooperate with the exterior gripping or rail engaging mechanism has been long known. An interior flanged wheel is found in the Mannix British patent, plaintiff's Exhibit 85, patented April 14, 1966. Flanged rollers may also be found in the Stewart patent, column 3, line 45 and following lines. The existence of the rail engaging means was disclosed as discussed under claim 1, and the further element of flanged wheels was known.

(j) That the single flange wheels are mounted on the support frame is not new. Reference to element 16 in figure 2 of the Plasser British patent and reference to the mounting of flanged rollers 743 and 745 on the support frame 35 in figure 7 of the Stewart patent indicate that this element of claim 11 was known, and is therefore not novel with the patent in suit.

(k) In the patent in suit the single flange wheels rest in operative position vertically and horizontally on the rails. This element is the same element found in column 3, lines 39 through 59 and in claim 7 of the Stewart patent. The element was known, and therefore was not novel with the patent in suit.

(l) The single flange of the wheels in the patent in suit face the gripping members for the same side of the track. This element is not new. The Plasser British patent states that each counter-roller is arranged opposite the associated lifting roller, page 2, lines 58 through 60. The facing element is also known in the Stewart patent, claim 6. The existence of facing rail engaging means was discussed in claim 1, and the further element of flanged wheels was not novel.

The Court determines that the elements of claim 11 of the patent in suit are not patentable because they represent elements that were known in the field, elements that were disclosed in printed publications that anticipated the patent or a combination of both.

The Court finds the claims 1, 2, 3, 5, 6 and 11 of the patent in suit, U.S. Patent Re. No. 29,437 to be unpatentable. Since the claims are not properly patentable, there can be no issue of infringement.

 The Court does not find that this case presents an exceptional case under 35

1022

U.S.C. § 285, and therefore does not award attorneys' fees to the defendant in this case. The publication upon which the Court has most heavily relied was disseminated approximately two weeks prior to the critical date. One of the patents considered crucial as prior art was patented less than two weeks before the critical date. The representations made by the plaintiff to the Patent Office cannot be said to have been intentionally misleading.

The Court also does not find that the plaintiff should bear attorneys' fees as sanctions under Fed.R.Civ.P. 35. The Court determines that many years have passed since the documents whose production is in dispute were printed or published, and that the documents sought were in several countries. Though the plaintiff failed to provide answers and admissions related to documents and failed to produce documents sought by the defendant, the Court cannot find that the plaintiff was guilty of bad faith in its failure to provide such answers, admissions and documents as promptly as the Court would have liked.

Judgment will be entered for the defendant.